**COMMERCIAL CREDIT CORPORA-TION, Appellant,**

v.

**William J. SORGEL, Executor of Estate of William R. Sorgel, Deceased, and Dorothy L. Foster, Appellees.**

**William J. SORGEL, Executor of Estate of William R. Sorgel, Deceased, and Dorothy L. Foster, Cross-Appellants,**

v.

**COMMERCIAL CREDIT CORPORA-TION, Cross-Appellee.**

**No. 17901.**

United States Court of Appeals
Fifth Circuit.

Jan. 18, 1960.

Rehearing Denied April 11, 1960.

C. W. Trueheart, Trueheart, McMillan, Russell and Westbrook, San Antonio, Tex., for appellant.

Leon P. Howell, Bradford F. Miller, San Antonio, Tex., for appellees.

·Before RIVES, Chief Judge, and HUTCHESON and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

Commercial Credit Corporation sued William R. Sorgel [1] on a personal guaranty for the sum of $94,443.62, together with attorneys' fees. As appellant here, it appeals from a judgment entered in favor of Sorgel and his daughter, Mrs. Foster, against it for the sum of $24,-318.14.

The suit was filed on a written guaranty under the terms of which Sorgel, a stockholder of Howard Distributing Corporation, unconditionally guaranteed "full and prompt performance" of a contract between Howard Distributing Corporation and Commercial Credit Corporation, executed previously thereto, under which

1. Sorgel has since died but the action continues against his estate.

Commercial Credit undertook to advance money on accounts receivable from customers of Howard to be assigned to it. By its terms the contract was to be construed by the laws of Illinois where it was executed. This contract of guaranty contained the following provisions:

"This shall be a continuing unconditional guaranty and indemnity, and shall not be limited to any specific sum. Notice of acceptance of this guaranty and presentment, protest and demand, and notice of protest and demand of any accounts, and notice of any non-performance or breach of said contract by customer [Howard], and all other notices to which undersigned [Sorgel] might otherwise be entitled, are hereby waived." [2]

The defendants resisted the suit on several grounds. They first contended that agents of appellant had represented to Sorgel that the financing agreement was not a loan but was a contract for the purchase of accounts. They then asserted that Sorgel would not have entered into the guaranty agreement at all except upon reliance on such statements. ▪ Unless amounting to such actionable fraud as would require the setting aside of the contract, proof of such representation would be unavailing as being merely an attempt to vary the written agreement by parol. These representations consist of two statements which Sorgel said were made to him several days before he signed the guaranty agreement: "When I went to the office they told me that they *could* not loan money on accounts receivable in Texas because the laws of Texas would not permit them to charge enough interest;" and "They advised me they were ready to enter into a contract to purchase the accounts receivable of the Howard Distributing Corporation." It is not disputed that thereafter the contract was shown to Sorgel and he read it before signing his guaranty.

It is the contention of appellees that the first statement was false, because it has been held that this contract *is* a loan contract, and thus the company *could* made loans in Texas. In submitting the special issue on this point to the jury over appellant's objection, the question was phrased: "Do·you find * * * that [appellants] represented to Sorgel, prior to his signing the guaranty * * that plaintiff *would* not make loans upon accounts receivable *originating in* Tex-

---

2. Much of the trial record was taken up by efforts of the appellees to challenge action or failure to act on the part of Commercial Credit, as to which the following provisions expressly relieve it of any obligation or responsibility:

"* * * Commercial Credit may compound, compromise and adjust any claim against Customer or any debtor on any Account, or grant any indulgences whatsoever to Customer or any debtor, without the consent of Undersigned or giving notice thereof to Undersigned. This guaranty and indemnity shall not be affected, impaired or diminished because any Accounts, documents, invoices or other paper writings are invalid, forged, fictitious or incorrect, or by the failure of any verification or examination of Accounts or books of Customer to disclose any irregularities or wrong-doings of Customer, or by any act of commission or omission by Customer or by any changes in the terms of the Contract, or in the amount of advance on the purchase of Accounts or in the rate of charges that may be agreed upon by Commercial Credit and Customer. Undersigned will jointly and severally pay and perform their obligations under this guaranty and indemnity upon demand, without requiring any proceedings to be taken against Customer or any debtor."

Much testimony was received also with respect to the nature of the financing agreement—that is whether it was an agreement by Commercial Credit to lend money to Howard on the security of accounts receivable or was an outright purchase of such accounts with agreement to repurchase. This Court having previously held as a matter of law that this contract was a loan contract, Blackford v. Commercial Credit Corporation, 5 Cir., 263 F.2d 97, all of the evidence and discussion of this matter on the trial below added nothing but confusion and thus made more difficult the task of the jury in isolating the true issues properly to be considered by it.

as." (Emphasis added.) This is obviously an entirely different question and is clearly not supported by any evidence whatever. No finding of fraud could be predicated on a jury's finding that appellant represented it *would* not loan money on accounts *originating* in Texas, whereas the only evidence touching on the point was to the effect that the representation had been that appellant *"could* not loan money on accounts receivable *in Texas* because the laws, etc." This is an entirely different type of representation. What was actually said, as we must find on conflicting evidence for the purpose of this appeal, was the expression of a *legal opinion*.[3] The representation the jury found to have been made was a statement of *intent* or *purpose*.

So, too, with the submission of special issue number 6, the jury found that appellant represented the financing contract "to be one for the *absolute* sale of accounts receivable and the *merchandise evidenced thereby.*" (Emphasis added.) There is, again, absolutely no evidence to support such a finding. Sorgel did not testify that it was represented to him that the contract was for the *absolute* sale of the accounts, and nothing was said at all about *sale of merchandise.* The great significance of this is that this contract *was* a sale of accounts receivable. The statement made, then, was a *true* rather than a false statement. The fact that it was a sale only to secure advances does not turn the representation that "they were ready to enter into a contract to purchase the accounts * * *" into a false statement on which a charge of fraud could be predicated.

■■ What has been said as to each of these two statements is entirely aside from the fact that, even assuming them to be statements of fact and to be false, there is no allegation or proof that the person making the representation made a false statement knowing it to be false. No such knowledge can be presumed.

"Fraud is never presumed, and the burden is on [the party asserting it] to prove it with reasonable certainty by a preponderance of convincing evidence." Roosth v. Lincoln National Life Ins. Co., 5 Cir., 269 F.2d 171, 179. No effort was here made to make such proof.

■ It is also extremely doubtful whether such statements could under any proof of knowledge be a predicate for fraud. "As a general rule, fraud cannot be predicated upon mere statements of opinion as to matters of law, especially where the statements are made by one in his avowed capacity as adversely interested." Meacham v. Halley, 5 Cir., 103 F.2d 967, 972. See also Mutual Life Ins. Co. v. Phinney, 178 U.S. 327, 20 S.Ct. 906, 44 L.Ed. 1088. In Reighley v. Continental Illinois Nat. Bank & Trust Co., 390 Ill. 242, 61 N.E.2d 29, 33, the Supreme Court of Illinois (the state of the construction of the contract) said:

"Both parties are presumed to know the law when they agree that it (the contract) is to be governed by the law of another State. Mutual Life Insurance Co. v. Phinney, 178 U.S. 327, 20 S.Ct. 906, 44 L.Ed. 1088."

The United States Supreme Court, in the cited Mutual Life Insurance Company case, said:

"When two parties enter into a contract, and make it determinable by the law of another state, it is conclusively presumed that each of them knows the law in respect to which they make the contract * * * and that neither one could be misled by any statement in respect thereto on the part of the other." [178 U.S. 327, 20 S.Ct. 911.]

■ We conclude that no defense of fraud could be predicated on the asserted representations, both because of what we have said above and because of the fact that on this record it is appar-

---

3. This opinion may be literally a correct one, according to a reasonable construction of the words used, but we do not pursue this point because it was not argued by counsel.

ent that such representations were not material. Appellees do not even contend they did not understand the rights and obligations of the parties to the financing contract. It is entirely immaterial whether they assumed to guarantee the performance of those obligations because they thought it was legally known as a loan contract or thought it was a contract of purchase and repurchase.

The next defense, and the only one of substance in light of what has heretofore been said, was that on September 25, 1953, the date on which the contract between Howard and Commercial Credit was terminated,[4] Howard not only did not owe Commercial Credit any sums, but, on the other hand, the latter was indebted to Howard in the sum of approximately $70,000. It was on the basis of this asserted claim that Sorgel and his daughter, as stockholders of Howard, asserted the counterclaim which resulted in a jury verdict and judgment in their favor.[5]

The case thus went to trial on the one substantial issue: What amount, if any, was Howard obligated under its contract with Commercial Credit to pay it on September 25, 1953, the date of the termination of this contract[6] and what additional credits and debits arose subsequent to that date?

The appellant made out its prima facie case by introducing its original ledger sheets which showed the total amounts of cash advanced by it to Howard; the amounts which it had recovered from the accounts assigned to it by Howard, leaving a discrepancy on July 12, 1954, nearly a year after the cancellation, during which time Commercial Credit continued to make collections which it applied to reduce the debt balance, to $41,790.12; to this was to be added the service charge as provided for in the financing agreement, plus expenses incurred by Commercial Credit, which total figures, as testified to by appellant's accountant witnesses, equalled the sum of $94,443.62.

The defendants, in the trial court, relied upon three basic efforts to attack the correctness of this figure in order to defeat appellant's claim and build up their own counterclaim.

### Correctness of Basic Figures.

The first effort was to make a vigorous attack on the correctness of the basic figures as shown on appellant's books. This was done by counsel's persistent cross-examination of the accountant and officer witnesses as to specific items, as to some of which no proof existed except the ledger entries themselves.[7] Counsel persists in this Court to attack the correctness of the basic figures.[8]

4. The contract was terminated by the giving of thirty days' notice signed August 26, 1953, as provided under the terms of the contract itself.

5. It will be noted that the counterclaim asserted by Sorgel and Mrs. Foster was predicated upon their right as stockholders of Howard to make such claim on behalf of the corporation which had since been dissolved, they suing on a derivative right. The several legal questions concerning the correctness of the trial court's order permitting such a counterclaim and the right of the individuals to receive for their own benefit the amount found by the jury to be due the Howard Corporation, need not be considered by us in light of the disposition which we make of the case.

6. Sorgel also notified Commercial Credit on September 25th that his guaranty agreement was terminated as of that

date. This, of course, would not affect any liability that had accrued under his guaranty up to September 25th.

7. The basic figures, of course, are (1) how much was paid by Commercial Credit to Howard, (2) how much did Commercial Credit recover from the accounts assigned to it, or otherwise, from Howard, and (3) what was the average outstanding daily balance of assigned accounts "purchased" by Commercial Credit. The service charges could then be mathematically computed since the contract provided that they should amount to a fixed percentage of such average outstanding balance per day.

8. Pursuing this effort the brief states several times that appellant's witnesses testified as to certain figures which would either be favorable to appellees or be inconsistent with appellant's position, whereas such testimony was in fact based

We think this will not do, since, after all, the basic ledger sheets were introduced in evidence and it is clear that whatever testimony was given by both the appellant's accounting witnesses and by appellees' one accountant witness, Montag, relating to what we have above referred to as the basic figures, is given from these ledger sheets. Moreover, as to them, Montag testified without equivocation that there was no difference between him and Rossiter except as to their application. See footnote 11, infra. This is substantiated by the fact that difference in treatment accorded by Montag to four items from that given to the same four items by appellant accounts to the penny for the jury's finding that Commercial Credit was indebted to Howard on September 25, 1953, in the sum of $2,595.98. Moreover, appellees' counsel, in his motion for a judgment based on the jury's verdict necessarily accepted the basis used by Montag in arriving at the figure of $2,595.98. It would, it seems, be inconceivable that appellees should be permitted to reject the very figures on which they requested and obtained a jury verdict and judgment in their favor.

Bearing on the question as to the correctness of the basic figures, however, there was one specific disputed item in the entries that entered into the final accounting on which Commercial Credit asserted an indebtedness from Howard to it of $41,790.12.[9]

This one item represents an entry on the ledger sheet dated September 1, 1953, entered as a debit of $13,098.94, bearing an entry "Ck. Howard N.S.F." Montag, whose testimony as an accountant witness was based exclusively upon his examination of the books, records and accounts of Howard and Commercial Credit long after the event, testified that he would not allow such a debit in his computations because there was no external evidence that such check had ever been issued by Howard and the check itself was not produced by Commercial Credit Corporation; that therefore there was not sufficient evidence that the charge-back was warranted. On the other hand, appellant's witnesses testified, and the books clearly disclosed, that on August 27, 1953, Commercial Credit had credited Howard with "cash received," of $20,708.28, on a remittance report No. 4529 from Howard, and that this remittance report included an itemized list of accounts totaling exactly $13,098.94. It was thus argued that there was con-

on certain assumptions counsel made in putting the question to the witness, or was merely explanatory of certain hypotheses. Two such instances are shown by the following statements in the brief:

"Appellant's witness Rossiter likewise testified (R. 670–1) that he could reconcile with that of Mr. Montag, and, in so doing if the $13,098.94 check was included as a debit against Howard Corp., there would be, according to his figures, $7,597.46, as of September 25, 1953; but if he excluded such check, then, as of that date, Commercial Credit was indebted to Howard Corp. for the sum of $5,492.48."

Reference to these pages in the record clearly demonstates that Rossiter did not testify that on the assumption stated the accounts between the parties would stand either as $7,597.46 in favor of Commercial Credit or $5,492.48 in favor of Howard. Rossiter's testimony on page 670–71 is an effort by him to explain the difference between his figures and an analysis made by appellees' witness. He does not testify that "if the $13,098.94 check was included as a debit against Howard Corporation there would be, according to his figures $7,597.46 due Commercial Credit as of September 25, 1953." Furthermore, reference to pages 710–13 clearly shows that he did not testify that "if he excluded such check, then as of that date, Commercial Credit was indebted to Howard Corp. in the sum of $5,492.48." At that point in his testimony he was merely adding and subtracting figures at the request of appellees' counsel, repeatedly stating that the result was not what he considered to be due on the account. In referring to his computations, made at counsel's request, he refers to them as "in this tabulation" and "on this accounting."

9. For convenience this will be considered as the principal amount sued for, because it does not include service charge and expenses provided under the terms of the contract.

vincing evidence that the charge-back was warranted by reason of the fact that credit for the identical amount had been given Howard on August 27th.

The issue as to the correctness of Commercial Credit's handling of this particular item was not separately presented to the jury, but the jury's finding that as of September 25, 1953, the balance in favor of Howard was $2,595.98 must necessarily have included acceptance by it of the appellees' treatment of this item. This is the only basic ledger entry which, in the present state of the record, appellees have saved their right to attack. In fact, Montag testified that if this entry was in error it was the only inaccuracy he had found in the books, reserving, of course, his opinion that other entries had been given the wrong legal effect. Appellees do not base this attack simply on its being an erroneous application of the sum of $13,098.94. They are forced to the position of asserting that this item is a completely fictitious entry, which resulted in increasing the charges against Howard by that amount, since Howard's debit balance, as shown on the ledger sheet, was simultaneously increased to the extent of $13,098.94. This is not said in the sense that appellees have in any way asserted that the appellant's bookkeepers intentionally or wilfully falsified the account, but it is said for the purpose of distinguishing the nature of this attack from the others later discussed as to which the company's figures are accepted, but the effect to be given them is challenged. If appellees' contention respecting this item is correct, it would necessarily follow that the sum of $13,098.94 had been entered on the books of Commercial Credit Corporation as "Ck. Howard NSF" when no such item existed.

The ledger sheets introduced on behalf of appellant were admitted in evidence under the Federal statute, 28 U.S.C. § 1732, which provides as follows:

"§ 1732. Record made in regular course of business. In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility."

We are thus faced with the question as to whether absence of the original check, which, according to the entry, was returned for insufficient funds, together with the absence of supporting evidence as to the issuing of such check, creates an issue of fact on which the jury could decide that the entry was incorrect.

We think the correct approach to this problem is that announced by Wigmore:

"(1) The party's book being virtually his testimonial assertion (ante § 1361), the rules for impeaching testimonial evidence (ante §§ 875–1087) so far as applicable, may be invoked * * *. In particular, the party's general character for veracity may be impeached; and the untrustworthiness of the book may be evidenced by demonstrating specific errors (ante § 1000) in the entries." Vol. V, Wigmore, § 1557.

Here there is no impeachment of the books. Appellees contend they impeached appellant's accountant witnesses by a few contradictory statements during the two trials and answers to interrogatories. This is not the issue. The question is: were the books impeached?

Neither of these witnesses made the ledger entries. They are received in evidence on the presumption that appellant, using them in the regular course of business, caused correct entries to be made. Absent any proof that there were errors in other entries or affirmative testimony contradicting this specific item [10] we think the entry must be taken as a "testimonial assertion" by appellant not contradicted by appellees. The item must therefore be given effect as a charge against Howard.

### Assignment of Accounts for "Credit".

The second effort of defendants was to contend that certain accounts receivable totalling $46,723.40, which were assigned after August 26, 1953, the date of the notice of cancellation thirty days hence, and as to which Commercial Credit made no payment to Howard, were accepted by Commercial Credit at the face amount of the invoices as cash, and that credits to Howard should have been increased in a corresponding amount. In response to a special issue presented to the jury it found that Commercial Credit had received this amount of accounts receivable at their invoice value as a payment on the balance due from Howard Distributing Corporation.

Commercial Credit objected to the submission of this issue to the jury, and urged before the trial court in its motion for judgment n. o. v., and urges here, that there was no evidence to support such a finding by the jury or that would warrant submission of such issue to it. We agree. Witnesses on behalf of the appellant who actually handled the affairs of Commercial Credit Corporation with Howard at the time of the contract's cancellation and immediately thereafter testified that accounts that were transferred by Howard to it after the notice of cancellation, and on which it advanced no additional funds under the financing contract, were assigned to it

and received by it as additional security. *No witness testified to the contrary.* Neither the officers nor employees of the Howard Corporation were offered by defendants to contradict the course of dealing testified to by appellant's witnesses. The latter testified that one of them, with Howard's permission, moved into the company's offices and assisted in making additional collections on all outstanding accounts, both those which had previously been assigned to Commercial Credit and those which were assigned subsequent to August 26th. Furthermore, he said he assisted Howard in the collection of accounts which had not even been assigned to Commercial Credit and all such collections were turned over to Howard and were not claimed by Commercial Credit. It was testified, without dispute, that all collection letters at least for the first several months after the cancellation, were sent out in Howard's name and Commercial Credit did not notify the account debtors that they had any interest in any of the accounts.

The only evidence on which appellees' theory is supported is testimony by its accountant witness Montag, which, in turn, was based upon his analysis of the books of Commercial Credit Corporation.

In order that his testimony can be understood, the following factual background must be stated: After August 26th, when notice was sent to Howard of the termination of the contract in thirty days, Howard assigned additional accounts receivable from its customers totalling $46,723.40 to Commercial Credit. No new money was paid to Howard on the assignment of these accounts. They were received, according to the testimony of the employees of Commercial Credit who sent to San Antonio during the thirty day termination period to look after the company's interests, as additional security for advances previously

---

10. The testimony of Bob Howard, presumably was available to prove the facts if the party desiring to attack an entry on the books sought to use it. True, there was some indication that he had left San Antonio, but no witness testified he had tried to find him without success.

made. This was the testimony of both W. F. Bracken, who went to Howard Corporation in San Antonio immediately following the notice of termination, and of Robert D. Weber, who succeeded Bracken and remained in the office of the Howard Corporation to see that such funds as were received by Howard on assigned accounts were remitted to Commercial Credit. No affirmative evidence in the nature of testimony by either Bob Howard, the president and manager of the Howard Corporation, or of any other officer of that company, or either of the two women employees who worked with Bracken and Weber during this period of time was tendered to substantiate the contention that is now made that this item of $46,723.40 of additional accounts receivable assigned to Commercial Credit was accepted by it as cash for full credit on the outstanding debit balance due it by Howard.

Appellees' theory that Howard was entitled to credit, as for payment, to the extent of the face amount of these additional invoices depends upon Montag's analysis of the admittedly correct figures entered on the books of Commercial Credit. He supported this theory in two ways. In the first place he said that since the contract terminated on September 25, 1953, he considered that all accounts receivable then held by Commercial Credit and which were not then past due must be treated as cash because the contract had to be closed out as of that date. His second approach was that since the items totalling 80% of the $46,723.40 figure ($37,378.71) appeared on Commercial Credit Corporation's ledger sheet in a column headed "Credit" he deduced therefrom that this was evidence that Commercial Credit intended to give Howard credit for the face amount of the accounts as for cash. This column is part of the division set up as "Reserve Adjustment." It does not purport to be a general "credit" column for crediting the debtor's account. Clearly when Howard turned over these additional accounts which appellant was not "purchasing," the amount of these had to be

entered somewhere on the books in order that when they were collected proper entries could be made. This is where they were entered. As between being a debit item or credit item vis-à-vis Howard, obviously they were a credit item. No conclusion can be drawn from such entry that it was an agreed final credit as if in payment.

[7] The Illinois courts have consistently held that where the relationship of creditor and debtor exists and the creditor holds security of the debtor, the receipt by the creditor of property from the debtor is not to be considered absolute payment except upon proof of an agreement to that effect. Cheltenham Stone & Gravel Co. v. Gates Iron Works, 124 Ill. 623, 16 N.E. 923, 924; First National Bank of Dolton v. Village of Dolton, 288 Ill.App. 85, 5 N.E.2d 732, 734. Appellees seem to accept this principle of law by accepting as applicable what we said in the Florida case Holcombe v. Solinger & Sons Co., 5 Cir., 238 F.2d 495, 500:

"* * * The taking of a bill of exchange or promissory note for a debt will operate as payment if so intended. In many jurisdictions the receipt by the creditor of the instrument as payment will be enough. 70 C.J.S. Payment § 23, p. 229. If such rule applied to the case before us there would be a further ground for holding the guarantor discharged as to the indebtedness represented by the trade acceptances. However, the Florida law requires that there be an express agreement that the giving of a negotiable instrument shall operate as a payment if it is to have that effect. * * *"

The question then becomes one of proof of mutual intent to treat the accounts as actual payment.

Sorgel lays great emphasis on the provisions of the contract appearing as Second Section (1) as justifying a finding by the jury that Commercial Credit had accepted the accounts at their face value as absolute payment. This paragraph reads:

"Commercial Credit may hold for purchase or as security any accounts, property, securities or moneys of customer which may at any time be assigned to or delivered to or come into the possession of Commercial Credit, or may apply the same or the proceeds thereof to the payment of any amounts which at any time then or thereafter are or might be owing to Commercial Credit by customer * * * "

It is clear that this provision extends some kind of option to the creditor to hold such accounts "for purchase or as security" and to "apply the same or the proceeds thereof to the payment, etc."

Inasmuch as the contract between the customer, Howard, and Commercial Credit transferred full title which Howard owned in all assigned accounts to Commercial Credit,[10a] this provision in Second Section (1) adds little to the powers which Commercial Credit could exercise with respect to such assigned accounts. While it is not entirely clear what is meant by holding such accounts "for purchase," it is plain that this is not the equivalent of saying that the creditor could take absolute title to them no matter how much their face amount exceeded the balance owed by Howard. Neither can it be said that when Commercial Credit received and retained them its action in doing so bound it as by an election to take them at their face value in lieu of payment. Since the holding of the accounts by Commercial began as a holding as security, and since this was the whole tenor and purpose of the security agreement, something more than an option to treat them as something different than security must be shown to convert such holding into payment. There is no evidence of an exercise by Commercial of any option to convert the accounts held as security into accounts taken at their face value as payment.

Similarly, there is no evidence that, assuming Commercial Credit had the right to apply the accounts *at any value it chose* to the payment of the indebtedness, it had, merely by receiving and retaining these accounts, which, under the contract, it had the right to receive and retain as security, elected to apply them as payment.

We think that, notwithstanding the terms of this provision, it would be necessary for a supplementary agreement to be made between Howard and Commercial Credit before security title in the latter could be converted into absolute title in satisfaction of any particular amount of the indebtedness. Certainly it seems clear that if the debtor were here protesting that the accounts were worth more than the balance of the indebtedness, Commercial Credit could not rely simply on this paragraph of the contract to justify its absolute appropriation of the accounts. In the absence of some subsequent agreement or some measure of foreclosure of the security the title of Commercial Credit continued to be title for collateral purposes only and not in final payment of the account.

Montag's testimony that because the contract terminated on September 25th these accounts were thus converted into cash instead of security hardly merits consideration. The whole course of dealing between Howard and Commercial Credit contemplated the use of accounts receivable as security for the payment of the amounts due under the financing agreement. This relationship was in nowise changed as to transactions arising before the date of termination merely because the contract had been brought to an end

---

10a. This provision is as follows:
"Customer warrants, guarantees, and agrees as follows: (a) Contemporaneously with the purchase of accounts, which shall be subject to and governed by this contract, customer shall execute 'Schedule of Accounts' or assignments so as to *vest in Commercial Credit full title to accounts*, and thereupon Commercial Credit shall become and be entitled to all of the ownership, title, rights, securities or guaranties possessed by customer in respect thereto and in respect to the property evidenced thereby." (Emphasis added.)

We conclude that there was no basis for the submission to the jury of the special issue as to whether Commercial Credit had accepted $46,723.40 worth of accounts receivable subsequent to August 26, 1953, to be credited upon Howard's account with it. This would eliminate a credit of $37,378.71 from the figures testified to by Montag and used in the jury's finding that on September 25th there was a net indebtedness of $2595.98 due Howard.

A subsidiary item, treated by Montag in the same manner as he treated the item of accounts receivable assigned after August 26th was the method of his handling the balance shown on Commercial Credit Corporation's books in the contingent reserve account. This account consisted of 20% of the face value of accounts receivable assigned by Howard during the life of the contract. Commercial Credit advanced in cash 80% of the face amount of the accounts and entered the remaining 20% in a contingent reserve account. Whatever balance there was in this account would ultimately be paid to Howard if there were no sums due by it to Commercial Credit. Montag charged Commercial Credit, and gave Howard full credit, for the balance of $18,371.09, which appeared on Commercial Credit's books as representing 20% of the face value of accounts theretofore assigned. It was not disputed that this figure represented simply 20% of the face amount of certain accounts receivable and did not represent cash actually collected on the accounts. It should be noted that in arriving at its principal claim Commercial Credit gave full credit for cash actually collected on these accounts. A further subsidiary item in the same category was Montag's treatment of an item of $1,828.90, which represented 20% of a small amount of accounts receivable assigned after September 25, 1953, which date was the date used by Montag in obtaining the figure of $18,371.09 above.

The significance of these specific items of $37,378.71, $18,371.09 and $1,828.90, is that, when added to the item earlier discussed as the "NSF" check for $13,098.94, and a debit against Howard of the September service charge, and an item of $2.88 telephone charge, are deducted the resultant figure lacks exactly $2,595.98 from coinciding with the figure of $67,355.55, which both sets of accountants agreed was a correct figure as to the balance due to Commercial Credit Corporation subject only to the treatment to be accorded to these four items.[11]

11. The following testimony of appellees' accountant witness Montag demonstrates clearly the basis for our conclusion that the parties differed at September 25th only with respect to the treatment of these four items:

"Q. [By counsel for appellant] Let me show you—I don't know whether you've seen it or not—a statement of account that was prepared by Mr. Rossiter, a certified public accountant from Chicago, from the books of the Commercial Credit Corporation. I'd like for you to go over that. Have you seen it before? A. Yes, sir, I have seen it.

"Q. Have you analyzed it? A. Only at September 25th. I did not—I reconciled my figures with his figures only at September 25th. I did not go into those other dates.

"Q. All right. You say you reconciled his figures with yours as of September 25th. Now, he shows as of September 25th that there's a large balance due to Commercial Credit Corporation by Howard Distributing Corporation; is that not correct? A. That is correct.

"Q. What is the balance that he shows due? A. $67,355.55.

"Q. All right. Now, slowly tell me how you reconciled those two accounts; that is, your showing due by Commercial Credit to Howard of the $2,595.98, and his showing due by Howard to Commercial Credit Corporation of $67,000 some-odd. A. Do you want the—I have the differences itemized. Do you want them or do you want his figure—

"Q. Yes, give me the differences itemized. A. I have taken credit for the journal entry reported to be an n.s.f. check in the amount of $13,098.94.

"Q. You've taken credit— A. For which I have no record.

"Q. —for a check of how much? A. $13,098.94.

"Q. All right. A. And eighty percent of the accounts assigned after Au-

This was the $2,595.98 which the jury said Commercial Credit owed Howard.

### Credit for Returned Merchandise.

The third effort by defendants was to charge Commercial Credit in the final settlement between it and Howard with a large amount of "returned merchandise" which had theretofore been invoiced to Howard's customers for the sum of $68,445.56 as payment on the account in the sum of $68,445.56. In order to understand this contention, which was not supported by any entries on the books of Commercial Credit Corporation, and thus was not supported even by the accounting testimony of Montag as to its treatment by appellant, is that after the letter of August 26th and the arrival in San Antonio of Commercial Credit's employees, Bracken and Weber, to look after the interest of their employer in the office of Howard Corporation, a substantial amount of merchandise that had theretofore been the basis of accounts receivable from Howard's customers was being returned to Howard. It was originally placed in several different warehouses by the joint action of Howard and Commercial Credit. A substantial part of the warehousing fees were later paid by Commercial Credit and that Company also subsequently insured all of this merchandise. Both of Commercial Credit's employees testified that such merchandise as was thus taken into the custody of appellant was held by it as additional security.[12] There is no testimony by any of Howard's officers or employees that such merchandise or any part of it was taken over by Commercial Credit under an agreement by it, concurred in by Howard, that Howard was to receive credit for an amount in cash equal to the original invoices under which the merchandise had been shipped out to Howard's customers. To the contrary, the only testimony as to the dealings between Howard and Commercial Credit, other than what has already been stated, is to the effect that Howard stated that he would attempt to sell the goods and create good accounts for it which he would then turn over to Commercial Credit Corporation, and the testimony of appellant's employees in answering questions put to them by appellees' counsel on cross-examination, in which they repeatedly stated that the company was holding this property as security for its debt.[13]

---

gust 26th, 1953, in the amount of $37,-378.71.

"Q. Yes. A. The contingent reserve at September 25th, 1953, in the amount of $18,371.09. And twenty percent of the accounts assigned after September 25th, in the amount of $1,828.90. Now, you add those figures and deduct the September service charges in the amount of $723.23; and September telephone charges in the amount of $2.88—

"Q. All right. A. —which gives you a total of $69,951.53, from which you deduct the $67,355.55, and it will give you a difference of $2,595.98.

"Q. In other words, Mr. Montag, there's no difference between your and Mr. Rossiter's figures. The only difference is in the way you treated them? A. Application, yes, sir.

"Q. The application of figures. In other words, there's no disagreement as to the basic books, but merely as to the method of applying. A. That is correct."

**12.** See the following testimony by Weber brought out by cross-examination:

"Mr. Howell: Q. I believe you just testified that the property that you repossessed, or that came into your possession, the accounts receivable, which had been purchased from Howard Distributing Corporation, you assumed was the property of the Howard Distributing Corporation at that time, is that correct?

"A. My understanding is this, Leon: that when the merchandise is taken back and put in the warehouse, as such, it was done by the client, and it was given to us to hold as collateral security, in trust, for the liquidation of the indebtedness, and if the indebtedness was liquidated and an excess arose from the liquidation, it would be paid to the client. If a deficiency arose, the client would pay Commercial Corporation.

"Q. That was your understanding?

"A. Yes.

"Q. That was your understanding about the matter?

"A. Yes."

**13.** An unsubstantial attack is made on this testimony by appellees by stating that,

462

The circumstances relied on by appellees to establish an agreement by Commercial Credit to accept the returned merchandise as cash payment on its claim against Howard is that Commercial Credit asserted dominion over it, paid warehouse charges on it, kept it insured, and in two or three letters seeking disposition of the merchandise by Howard or in correspondence with the warehouse, spoke of the merchandise as "ours."

What we have heretofore said as to what is necessary to convert the accounts receivable into a cash payment on an indebtedness applies with equal force here. There was no attempt made by appellees to show that either by word or conduct either Howard or Commercial Credit proposed that the merchandise be taken in lieu of cash; much less is there any effort to prove that *both* parties agreed to such a proposal. It is too plain to require comment that the exercise by a mortgagee or other lienholder of dominion over the mortgaged or pledged property, either for the purpose of insuring it or warehousing it or to obtain sales of it in cooperation with the pledgor or debtor, is entirely consistent with its position as a holder of security and does not convert its interest in the property to that of outright owner. Furthermore, there is nothing to warrant a conclusion that such ownership, even if taken outright, was on the agreed amount of the original $68,445.56, at which it had been billed to Howard's customers.

Both parties agreed that the face amount of the accounts receivable assigned after August 26th was $46,723.40. There was no proof as to whether or when, if ever, *the accounts receivable* represented by the $68,445.56 worth of returned merchandise (as distinguished from the merchandise itself) were assigned to Commercial Credit. It is mathematically certain that not more than $46,723.40 worth of them were so assigned, because only that much in accounts were transferred after August 26th. It was proved without dispute that some of the merchandise was sold on accounts that were never assigned to appellant. The amounts or identity of such accounts were never proved. There was, therefore, no basis for submitting to the jury special issue number 10, or its finding that "the plaintiff, Commercial Credit Corporation, accepted the returned merchandise which was stored in its name in the various warehouses after August 26, 1953, in satisfaction of the accounts receivable represented by the invoice value [found by Issue No. 13 to be $68,445.56] of such returned merchandise."

One of the inconsistencies in appellees' theory of application of the accounts receivable item and the returned merchandise item as credits in favor of Howard is that the evidence clearly shows that a substantial part of the merchandise was returned and warehoused during the month of September, 1953. Thus, assuming all of appellees' other contentions were correct, when they submitted issue No. 19, "what do you find from a preponderance of the evidence to be the amount of money, if any, due Howard Distributing Corporation from Commercial Credit Corporation, if any, as of September 25, 1953," and they received the answer "$2,595.98," appellees could, of course, not claim the advantage of any part of the $68,445.56 merchandise offset to establish a counterclaim *in addition* to the $2,595.98, because there is no proof as to how much of this merchandise was actually warehoused prior to September 25, 1953. Under appellees' theory all such was credited to Howard and was thus incorporated in the finding of the $2,595.98 figure in special issue No. 19. Nevertheless, appellees urged, and the trial court found for them, that they were entitled on their counterclaim to the sum of $21,722.16, as overpayment from Howard to Commercial Credit, this representing the difference between the $68,-

after vigorous cross-examination as to the meaning of "collateral," "security," "ownership," and "title" one of appel-

lant's witnesses was unable to give a proper characterization of the quality of appellant's possession.

445.56 figure, which the jury had found Commercial Credit had accepted in payment of an equal amount of accounts, and the $46,723.40 figure which the jury found Commercial Credit had accepted in accounts in lieu of cash. Thus, even though we were not required to hold on this record that neither the merchandise nor the accounts transferred after August 26th were accepted by agreement of the parties as cash, we would be compelled to hold that there is no basis to support a finding by the Court, based on the jury's findings on the special issues that Howard was entitled to an additional claim of $21,722.16. This amount was necessarily already included in the computation of the balance due as at September 25th.

### Credit for Commercial Credit's "Negligence".

Holding, as we do, that the application made by appellees' accountant witness as to all four items in dispute was not legally permissible on the record before us, and in light of the fact that but for these four items no attack is successfully made on the accuracy or correctness of the amount claimed to be due as a principal item under the contract, it is clear that the judgment would have to be reversed and, as to the principal amount, a

judgment rendered for the appellant unless there is merit in appellees' further point—that is, that if the merchandise held by Commercial Credit was held as security for Howard's indebtedness, then appellees are nevertheless entitled to a credit in the sum of $68,445.56, because, while holding it as security, appellant was so negligent as to disposition of it for the benefit of all parties at interest that Sorgel was released as guarantor of Howard's account.

This contention must be viewed against the following factual background. Following the termination of the contract on September 25th Commercial Credit's employees were present in Howard's office attempting to collect the balance due their company, and in so doing they were doing all they could to collect, in the name of Howard Distributing Corporation, all outstanding accounts; merchandise was being returned as not satisfactory; Howard was unable to pay its debt to Commercial Credit;[14] Sorgel had become dissatisfied with Howard's operation and had filed suit against it; he and the Howard Corporation had made an effort to compromise their differences unsuccessfully; then on October 23, 1953, Sorgel's counsel wrote appellant asking for a statement as to its claim against Sorgel.[15] Appellant responded, first, on

14. There was no evidence to warrant the submission of Howard's ability to pay to the jury. The undisputed evidence was that it was unable to do so.

15. This letter follows:
"Leon P. Howell
"Attorney at Law
"1412 Alamo National Banking Building
"San Antonio 5, Texas
"October 23, 1953
"Agreement and Contract October 12, 1953 and October 13, 1953, respectively, by and between William R. Sorgel, Sr. et al and Bob Howard et al.
"Mr. W. F. Bracken
"Assistant Vice-President
"Commercial Credit Corporation
"222 West Adams Street
"Chicago 6, Illinois
"Dear Mr. Bracken:
"Reference is made to the above agree-

ment and contract with which you are familiar.
"Mr. Howard and his associates have failed to perform said agreement and contract and are wholly in default thereon.
"My clients, Mr. Sorgel and Mr. and Mrs. Edward L. Foster, have instructed me to immediately institute appropriate legal action to protect their interests, so if your company now considers my clients or either of them, liable to any degree or extent on the contract of April 17, 1953, between your company and Howard Distributing Corporation it is requested that you let me have a statement thereof prior to November 2, 1953, in order that same can be considered in conjunction with such proposed suit.
"Sincerely,
"s/ Leon P. Howell"

October 26th, by making formal written demand on Sorgel and Mrs. Foster (a co-guarantor) for the payment of $57,099.56,[16] which amount it said was "presently past due and owing to us due by Howard Distributing Corporation," and, second, by writing Sorgel's lawyer on November 2nd enclosing copies of the letters to Sorgel and Mrs. Foster.

The record is silent as to any request from Sorgel to Commercial Credit relative to the merchandise thereafter until after Commercial Credit had filed suit on the account in the state court in Wisconsin.

When demand was made in October, 1953, appellant had not yet paid for any warehousing or insurance on the merchandise. The testimony was that it was being put into the warehouses upon being returned by Bob Howard, acting in conjunction with Commercial Credit's employees who were then at his place of business.

Obviously, under universally established rules of law, Sorgel could have paid Commercial Credit the amount of its valid claim (in the event it disputed the correctness of the account it could have made a tender of what was actually due) and have been subrogated to all the rights Commercial had as to all remaining unpaid accounts receivable and all merchandise of Howard Corporation, which it then held as security for its debt. Sorgel was at that time being fully advised by counsel who had already instituted one lawsuit for him against the Howard Corporation, and who had already made demands on Commercial for the filing of its claim. Sorgel, of course, is charged with notice that the contract he guaranteed contemplated that appellant would hold accounts and the goods they represented as security.[17] For him now to say that Commercial Credit's warehousing of this merchandise after Howard's warehousing payments had expired, paying insurance premiums for its protection and holding it secure except as against sales by Howard for good solvent accounts amounted to a failure of its duty to Sorgel as guarantor merely because it did not actually find purchasers for it before it became worthless,[18] is to put the cart before the horse. It was Sorgel's duty to pay the amount due and then take over the security if he wished to do so. We know of no rule of law that would require appellant at its own expense and at its peril, to put on an active sales campaign to attempt to dispose of this returned merchandise. Moreover, the evidence is undisputed, although appellees' brief incorrectly states to the contrary, that appellant did try to sell the merchandise. Bob Howard, the manager and principal debtor, recognized its obligation to attempt to dispose of it and he at no time complained of

16. This letter was as follows:
 "October 26, 1953.
 "Mr. William R. Sorgel
 "838 West National Avenue
 "Milwaukee, 4 Wisconsin
 "Dear Mr. Sorgel:
 "As a guarantor of our Accounts Receivable Contract with Howard Distributing Corporation, accepted by us on April 28th, 1953, we would advise you that there is presently past due and owing to us due by Howard Distributing Corporation the sum of Fifty-seven Thousand Ninety-Nine Dollars and Fifty-six Cents, (57,099.56). Demand is hereby made upon you for the payment of said account.
 "Yours very truly,
 "H. Kratz Assistant Secretary.
 "em"
 A similar letter was sent to Mrs. Foster.

17. The contract provided that Howard warranted, guaranteed and agreed as follows:
 "Second. Customer warrants, guarantees and agrees as follows: (a) Contemporaneously with the purchase of Accounts, which shall be subject to and governed by this Contract, Customer shall execute 'Schedule of Accounts' or assignments so as to vest in Commercial Credit full title to Accounts, and thereupon Commercial Credit shall become and be entitled to all of the ownership, title, rights, securities or guaranties possessed by Customer in respect thereto, *and in respect to the property evidenced thereby*, including the right of stoppage in transit; * * *." (Emphasis added.)

18. It was finally sold at a judicially ordered sale and brought only a nominal amount.

Commercial Credit's inactivity thereabout. The only evidence by which appellees sought to create even an inference of negligence was appellant's failure to sell the merchandise while held by it. There is absolutely no proof to support appellees' contention that it would not have sold the merchandise at a fair price to any purchaser who sought to buy and have given credit for the proceeds of such sale on its claim against Howard. This claimed obligation of Commercial to attempt to sell the merchandise is even more than would be required of a surety. See First National Bank of Fort Worth v. Brown, Tex.Civ.App., 172 S.W.2d 151. There is no such standard of care required in the case of an unconditional guarantor. Thus, there was clearly no basis on which the trial court could submit an issue of negligence to the jury.

Moreover, there was a complete failure of proof as to the damages resulting from such conduct by Commercial Credit even had it amounted to negligence. The jury merely found that "Commercial Credit Corporation failed to use the degree of diligence that an ordinary prudent person would have exercised under the same or similar circumstances to sell the merchandise that was stored in the *Texas Bonded Warehouse* prior to the filing of the application for sale on October 19, 1955," and that "the actual value * * * of the merchandise stored in *various* warehouses in the name of Commercial Credit Corporation at the time it was so stored," (emphasis added) was $68,445.56.[19] There was no issue put to the jury as to whether the failure of Commercial Credit "to use the degree of diligence that an ordinary prudent person would have exercised" was the sole or even a contributing cause to the loss of whatever value the merchandise in that particular warehouse had and even that figure was not proved. There was no effort to prove that by the exercise of the greatest diligence and care Commercial

Credit would have been able to dispose of any, much less all, of the merchandise. There was no possible basis for these findings to warrant the conclusion that there was a negligent loss of $68,445.56, or any other specific figure.

■ We conclude that there is no defense of negligence in the handling by Commercial Credit of the stored returned merchandise in light of the nature of appellees' guaranty.

■ We find also that there was no basis for the trial court to submit to the jury a special issue relating to a demand by Commercial Credit on Howard when the contract was terminated. It is really without dispute that Commercial Credit made oral demands for payment. No written demand was required even under appellees' theory. The witnesses repeatedly stated that they claimed and sought to get the money from Howard when they were in his place of business assisting him with his collections immediately after the cancellation. It is manifest that Howard recognized its obligation to pay but was "unable to do so." Such course of dealing would amount to a waiver of demand. The law does not require a creditor to make a demand of a debtor who is admittedly unable to pay. There is, of course, no dispute about the demand being made on Sorgel within a month of the date of termination at a time when he could do whatever he felt advised to do for his protection. In his subsequent correspondence he did not contest the claim on the ground of a failure to make formal demand on Howard. This special issue should not have been submitted to the jury.

■ There remains the question as to the amount of service charge that is due under the terms of the contract. Appellees made the contention that the service charges were incorrectly figured, if any were due at all, because they were

19. It will be noted that the alleged negligence was found only as to that merchandise in one warehouse. It was clearly proved that there was goods stored in several warehouses and it was the total that was found to be worth $68,445.56.

figured on the average of the outstanding balances of uncollected accounts receivable rather than on the principal amount due Commercial Credit Corporation. This is in substance what the contract provides for. The terms are:

"At the end of each month Commercial Credit will bill Customer for charges in connection with the purchase of Accounts during such month, and Customer will pay said charges forthwith. Said charges shall be computed upon the basis of the average daily outstanding face of Accounts during such month, the charges to be determined by applying against such average daily outstanding face of Accounts the proper percentage shown below, depending upon the amount of the average daily outstanding face of Accounts during such month; provided however Customer agrees that the minimum charge to be paid Commercial Credit in any one month in connection with accounts outstanding during such month will be two hundred dollars ($200.00)

| Average Daily Outstanding Face of Accounts During Month | | Rate Per day |
|---|---|---|
| (BH) | 0. to $25,000.00 | 1/30% |
| (WFB) | $25,001.00 to $50,000.00 | 1/32% |
| | $50,000.00 and over | 1/34%" |

As we have already indicated, Howard transferred a substantial amount in accounts receivable to Commercial Credit after August 26, 1953, for which Commercial Credit did not advance any additional money. It cannot be said, therefore, that such accounts were "purchased." Any construction of the language of the contract that would entitle the finance company to increase the base on which it computed interest or service charge merely because it received additional accounts as security for its advances would be extremely unrealistic. We think there is no doubt that the contract meant that the service charge should be figured on the average daily balance of accounts actually "purchased," or on which Commercial Credit had actually advanced 80% of the face value. We think it clear that the service charge was not so computed, and that the item of $39,739.87, claimed as service charge as of the date of trial, was substantially in excess of the amount authorized under the contract.

Appellees finally bring forward the contention that Sorgel has been released on his guaranty because, while he was sued together with his daughter and Bob Howard, all of whom signed the guaranty, appellant dismissed the suit with prejudice as to the other two defendants.[20] Thus, they say that Commercial Credit, in effect, released two of three obligors and thus released all. Whether the dismissal of the suit against two co-guarantors be viewed in light of the relationship of co-obligors under a simple contract or in light of the relationship of cosureties, we think the contention is without merit. If we consider the dismissal against Howard and Mrs. Foster as a release of two or three parties under joint and several obligations on a contract of guaranty, the true rule is as set forth in Restatement, Law of Contracts, Section 123:

"Section 123. Discharge of Joint and Several Promisors. Where the obligee of joint and several contractual promises discharges a prom-

20. Mrs. Foster filed a plea of coverture, asserting that under the Texas law she could not legally, as a married woman, guarantee the debt of another. Howard was not served.

isor by release, rescission or accord of satisfaction, the other promisors are to be discharged from their joint duty, but not from their several duties, except in the cases and to the extent required by the law of suretyship."

If we consider the dismissal of the suit against these parties as a release of two of three cosureties, we think the following rule would apply:

"Section 135. Release by Creditor of One of Several Cosureties. * * * (2) Where the creditor releases one of several cosureties and as a part of the release reserves his rights against the remaining sureties, the release as such does not have the effect of discharging or reducing the obligations of the remaining sureties." Restatement of the Law, Security, Section 135.

 This provision is applicable here because, by insisting on the prosecution of its suit against Sorgel while dismissing as against the others, Commercial Credit clearly "reserve[d] [its] rights against the remaining sureties." In such circumstances the release did not in any way affect the liability of Howard or Mrs. Foster to respond to Sorgel in case he should seek contribution as against them. See Restatement of the Law, Security, Section 135, Comment on Subsection (2), page 367.

Finally we need not decide the question whether Sorgel and Mrs. Foster had the legal right to counterclaim on the basis of asserted overpayments of the Howard Corporation, because, on the record, we have found that no such overpayments could be found by the jury.

We have analyzed the issues, including the figures, in light of the testimony and lengthy arguments of counsel contained in the nearly 1500 pages of the record and more than 400 pages of briefs, reply briefs and answers and supplemental answers to reply briefs, and with the greatest difficulty have arrived at what we consider to be the grains of truth. They have been deeply hidden in much chaff. We conclude that such analysis, once

made, shows that, without factual dispute, the principal sum of $41,790.12 was owed by Howard Corporation to Commercial Credit on July 12, 1954. We find no substantial issue drawn as to the debits or credits after that date except as to the computation of the service charge. The jury found the amount of attorneys' fees without reference to the amount of recovery. It is not contested. We hold, therefore, that on the record before us there was no substantial issue of fact as to appellant's right to recover the sum of $41,790.12, as principal amount due on July 12th, $13,013.63 expenses covered by the contract, and $23,000 attorneys' fees. There must still be determined the amount due as service charge. In the light of the standard which we have set out above, we do not perceive that there can be any issue of fact as to the amount of this charge. In view of the complicated state of the record, however, we do not determine as a matter of law that there is no remaining issue for jury determination on this feature of the case, but leave this for the trial court to determine.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.