**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Carl Jonathan NILL, Defendant-Appellant.**

**No. 74-3428.**

United States Court of Appeals, Fifth Circuit.

Sept. 5, 1975.

Albert J. Datz, Jacksonville, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Peter L. Dearing, John J. Daley, Jr., Asst. U. S. Attys., Jacksonville, Fla., for plaintiff-appellee.

Before TUTTLE, COLEMAN and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge.

A jury in Jacksonville, Florida, convicted Carl Jonathan Nill on both of the following charges:

On or about the 13th day of January, 1970, in the Middle District of Florida,

## CARL JONATHAN NILL

knowingly and fraudulently did present a false claim in the amount of $13,593.05, for proof against the estate of Jacksonville Tile Company, Bankrupt, Court No. 69–222–BK–J, which said sum purportedly was the outstanding balance on a loan to the bankrupt by The State Bank of Jacksonville, whereas, in truth and in fact, as CARL JONATHAN NILL well knew, said sum and loan had been repaid to the bank on October 28, 1969, and the balance on said loan as of January 13, 1970, was ".00"; in violation of Title 18, United States Code, Section 152.

and

On or about the 23rd day of June, 1970, in the Middle District of Florida, after the filing of a bankruptcy proceeding in the matter of Jacksonville Tile Company, Bankrupt, Court No. 69–222–BK–J,

## CARL JONATHAN NILL

knowingly and fraudulently did withhold from Victor E. Raymos, Trustee in Bankruptcy of the Bankrupt, documents relating to the property and affairs of the bankrupt; that is, a liability ledger card in the name of Jacksonville Tile Company from The State Bank of Jacksonville showing loans and repayments during the period of May 9, 1969, to October 28, 1969, showing an outstanding balance of ".00" on October 28, 1969, the said Victor E. Raymos, as such Trustee, being then entitled to possession of such liability ledger card; in violation of Title 18, United States Code, Section 152.

On appeal, Nill urges that the evidence was insufficient to support his conviction for either offense and that prejudicially irrelevant evidence was admitted against him.

Both of the offenses for which the appellant stands convicted arose from his activities as a loan officer at the State Bank of Jacksonville, Florida, wherein

he used his position to make bank loans to his financially troubled corporation, the Jacksonville Tile Company.

## Count I

In April, 1969, Nill and another individual, acting on behalf of a corporation which they wholly owned, bought Jacksonville Tile Company. Within a few weeks after the purchase, Nill, as bank loan officer, approved a $10,000 loan to the Tile Company. Additionally, he loaned Tile Company President James Lynch $5,000, which Lynch used to benefit the Tile Company. In mid September, 1969, when the Tile Company bankruptcy appeared imminent, appellant sought to protect Lynch. On behalf of the Bank, he took a $5,000 note from the Tile Company in exchange for Lynch's note. The $5,000 note was, however, endorsed by Lynch.

A petition for involuntary bankruptcy was filed against the Tile Company on September 30, 1969.

A month after this petition was filed, apparently in an effort to insure that the Bank would be paid, or to erase the impression that he was loaning the Bank's money to debtors financially unable to repay, defendant persuaded James Lynch to give the Bank a note for the amount of money which Tile owed the Bank. This Lynch note was for $20,-000. It covered not only the two outstanding notes of the Tile Company but also a note owed by a Lynch employee as well as a sum that was advanced to Lynch himself. The following instruction was stamped on the note:

"THIS IS YOUR AUTHORITY TO DISBURSE TO:

| | |
|---|---|
| JACKSONVILLE TILE COMPANY COMM. NOTE 61595 | $10,144.44 |
| JACKSONVILLE TILE COMPANY COMM. NOTE 62045 | 3,612.96 |
| INSTALLMENT LOAN OF GEORGE D. BOND, JR. 42321 | 4,679.63 |
| BALANCE TO JAMES L. LYNCH | 1,562.97 |
| | $20,000.00 |

s/ James L. Lynch
JAMES L. LYNCH"

The Tile Company notes were neither cancelled nor surrendered. Nevertheless, the bookkeeping department at the Bank credited its "Notes Receivable—Tile Company" account with the proceeds of the above note, thereby leaving a zero balance on the bookkeeping records.

By way of greater detail, it was shown that the defendant had been involved in many financial enterprises. For many of them he approved loans from the State Bank of Jacksonville, of which he was vice president and loan officer, to corporations in which he had a substantial financial interest. He approved these loans without disclosing to the Bank his financial interest in them and, of course, without securing the prior approval of the Board of Directors of the Bank. This appears to have been a violation of state law and sheds light on the motives and methods by which Nill operated but, obviously, he was not here being tried for this conduct.

In many of these activities Nill's partner was James Lynch. Nill personally approved loans totalling over $450,000 to Lynch, despite the fact he had been cautioned by the loan officer who had previously managed Lynch's account to limit Lynch's line of credit to $20,000, and these funds were used in ventures owned jointly by Lynch and Nill.

Nill had negotiated the sale of Jacksonville Tile for one dollar, and thereafter approved several loans to it in an effort to make it profitable. The efforts failed, and, as already stated the company was sent into involuntary bankruptcy.

The record would warrant an inference by the jury that such a bankruptcy of a debtor of the Bank would come to the attention of the general counsel of the Bank; that at this time Nill's history of self-dealing would have been revealed to the Bank and that Nill undertook to prevent this from happening. It could have been inferred that he had devised the strategem of having James Lynch assume the Tile Company's debts, that he persuaded Lynch to sign a promissory note for $20,000—$13,757.40 used to dis-

charge the two Tile Company notes, $4,679.63 to discharge the debt of one George Bond, and the remaining $1,562.97 going to Lynch in cash. The Bank records showed no balance due on the two outstanding Tile Company's notes, but it is equally true that Tile's notes to the Bank had neither been cancelled nor surrendered.

On January 13, 1970, Nill submitted a claim to the Trustee in Bankruptcy on behalf of the Bank, claiming $13,593.05 as the outstanding amount owed the Bank by the Tile Company. He then made the unusual request that any subpoenas issued by the Trustee be sent to him personally, rather than to counsel for the Bank. Six months later a subpoena was issued by the Trustee, requesting that the $13,593.05 claim be documented with bank records. Nill submitted a loan liability card which showed a $13,593.05 balance owed by the Tile Company when, in fact, the original bank liability card showed a zero balance. The Trustee eventually paid $8,593.05 to the Bank; his check on behalf of the bankrupt was deposited in the account of James Lynch, and was shown to have been used to reduce Lynch's total indebtedness to the Bank.

With this exposition of the facts, we now turn to the applicable law.

■ A promise of payment by a third party does not in and of itself relieve the primary obligor. A person is entitled to the benefits of *all* the contracts he has made. He may obtain one or a hundred promises to pay a given debt and is entitled to enforce any one of them, even though he, of course, is entitled to but one performance, *Wishart v. Gates Rubber Company Sales Division, Inc.,* 163 So.2d 503 (Fla.App., 1964). In exchange for his note a third party can obtain a contract from the creditor for the release of the debtor. The debtor can enforce this contractual release, or promise to release, in any jurisdiction which would recognize the debtor as a third party beneficiary of the discharge contract.

■ Florida apparently is a jurisdiction which allows the debtor as a third party beneficiary to enforce a release agreed upon by his creditor and a third party. In *Wishart, supra,* individual officers of a corporation executed a note to plaintiff. Subsequently, plaintiff, feeling insecure, took a note from the corporation for the debt that the individuals owed. Upon receiving the corporation's note, the plaintiff credited the individuals' accounts, thereby showing that the individuals owed plaintiff nothing.

Subsequently, plaintiff sued both the corporation and the individuals. One of the individuals defended on the ground that the corporation's note had discharged the individuals. The Court expressly recognized that the creditor and a third party could enter an agreement to discharge debtor which would be enforceable by debtor. It went on to hold, however, that the agreement must be an express one:

> "The law in Florida seems to require that there be an express agreement that the giving of a negotiable instrument shall operate as a payment if it is to have that effect. This rule was announced in *Frank v. Williams,* 36 Fla. 136, 18 So. 351, and prior thereto, in *Salomon v. Pioneer Co-operative Co.,* 21 Fla. 374, and cited with approval in *Holcombe v. Solinger & Sons Co.,* (5th Cir.) 238 F.2d 495, 74 A.L.R.2d 728, 733. Since the intention and purpose of the taking of the promissory note in this instance appears conclusively to have been for the purpose of further securing the debt due by Tire Service to the appellee, no factual issue as to intent was left for the jury to determine." 163 So.2d at 506.

Conceding the generally questionable nature of Nill's practices and conduct, the fact remains that the claim was filed on behalf of the Bank. The crucial issue is whether the $13,503.05 indebtedness to the Bank had been conclusively extinguished by the Lynch notes. If the Tile Company remained liable on its notes, the claim, whatever the surrounding con-

notations, was not false. This, of course, is Nill's defense, the adequacy of which we have to judge on this appeal.

■■ In *Murphy v. Green,* 102 Fla. 102, 135 So. 531 (1931), it was said:

"A novation, as understood in modern law, is a mutual agreement between the parties concerned, for the discharge of a valid existing obligation by substitution of a new valid obligation on the part of the debtor. Novation does not result from the mere substitution of one paper writing for another, or one evidence of debt for another, but only by the substitution of a new obligation for another with intent to extinguish the old one.

"If there is an express agreement by the creditor to receive a note as absolute payment, and to run the risk of its being paid, it will be held to be an extinguishment or payment of the precedent debt, whether the note is afterwards paid or not, but a clear agreement or manifestation of intention of both parties to that effect is essential." 135 So. at 534.

It will be noted that the Court spoke in terms of "express agreement" and said further that "a clear agreement or manifestation of intention of both parties to that effect is. *essential* " (emphasis added) 135 So. at 534.

The meaning of this language seems plain: In the absence of a *clear agreement* (and there was none shown by the evidence in this case) there must be a clear manifestation of an intention that such was the agreement. In the end, this amounts to the same thing.

These Florida cases were decided in the context of civil litigation, requiring only a preponderance of the evidence, while we are here concerned with a criminal prosecution, in which the clear intention must be manifested beyond a reasonable doubt.

Nill's defense is that there had been no novation, hence no fraudulent claim.

It will be remembered that the allegedly false and fraudulent claim was filed on January 13, 1970. The original

bank card was withheld on June 23, 1970. It was not until December 1, 1970 that this Court decided *Capital National Bank of Tampa v. Hutchinson,* 5 Cir., 1970, 435 F.2d 46, a case "involving fraud, shoddy business practices and misplaced trust". In multiplicitous transactions among various parties, involving promissory notes, there were bookkeeping entries that accounts had been "paid" and there were notes supposedly paid but not surrendered or cancelled.

In the analysis of this situation, it was held [per Dyer, J.]:

"Florida law with regard to the acceptance of a promissory note in satisfaction of an antecedent debt is nebulous. On the one hand, Florida courts have held that novation, which extinguishes the old debt, may be implied from the facts and circumstances attending the transaction and the parties' subsequent conduct. *Orlando Orange Groves Co. v. Hale, supra* [119 Fla. 159, 161 So. 284]; *see Fontainbleau Hotel Corp. v. Crossman, supra* [5 Cir., 323 F.2d 1937]. On the other hand, these same courts have stated that Florida law requires an express agreement that the giving of a promissory note or negotiable instrument shall operate as payment before it can have that effect. *Seaver v. Stratton,* 133 Fla. 183, 183 So. 335, 337 (1937); *Wishart v. Gates Rubber Co. Sales Div., Inc.,* 163 So.2d 503, 506 (Fla.Dist. Ct.App.), cert. denied, 169 So.2d 386 (Fla.1964); accord, *Commercial Credit Corp. v. Sorgel,* 5 Cir. 1960, 274 F.2d 449, 458, cert. denied, 364 U.S. 834, 81 S.Ct. 48, 5 L.Ed.2d 59; *Holcombe v. Solinger & Sons Co.,* 5 Cir. 1956, 238 F.2d 495, 500. Moreover, the mere fact that a receipt or ledger contains the words 'paid in full,' or similar phraseology, does not render parol evidence inadmissible with respect to it. *Phillips v. Frost,* 147 So.2d 568, 569 (Fla.Dist.Ct.App.1962)."

At another point the Court said, "necessarily incident to any novation is the extinction of the prior contractual obligation".

Upon extensive analysis, the Court concluded, "ultimately the question whether there has been an express agreement that a promissory note is to be considered as payment for an antecedent debt is one of fact for the jury". This was followed by:

"As the Florida Supreme Court stated in *Frank v. Williams,* 36 Fla. 136, 18 So. 351, 356 (1895), a landmark case in this area,

[i]t is true, as a general rule, that the mere acceptance by a creditor from his debtor of a promissory note for a pre-existing contract debt does not, in the absence of an agreement to that effect, extinguish the original demand. *May v. Gamble,* 14 Fla. 467; *Salomon v. [Pioneer] Cooperative Co.,* 21 Fla. 374. In such case no recovery can be had on the original cause of action unless the note is produced to be canceled, or, in case of its loss, the establishment of such fact. Whether a note taken for an antecedent simple contract debt be in settlement and satisfaction thereof is a question of intent, it seems, to be determined as other facts of a case."

■■ It is indisputably fundamental that the criminality of an act must be judged in the light of the law applicable at the time the act is committed. It accordingly seems clear that Nill had a right to rely on the Florida weight of authority as it existed prior to December 1, 1970, which was that in the absence of an express agreement or a clear manifestation of an intention amounting to the same thing, there is no novation. At the very least, under the facts of this case he is entitled to the benefit of the later stated rule that the existence or absence of a clear manifestation of an intention to have so agreed is a jury question. On the latter premise, he could not be branded criminally for submitting the claim and, if it was contested, to have the factual issue decided in the bankruptcy court.

The Bank continued to hold Tile's uncancelled, unsurrendered notes. It had not collected the Lynch note. Even in bankruptcy Tile's $13,593.05 notes turned out to be worth $8,593.05. They were not worthless paper. Nill testified under oath that there had been no express agreement and no intention of making one. Under protracted cross examination, Lynch failed to contradict this testimony in any material particular.

The indictment specifically charged that the Tile indebtedness "had been repaid to the bank [by the Lynch note] on October 28, 1969". To establish that the claim was indeed fraudulent the government had to prove a novation beyond a reasonable doubt, remembering that the bank had neither cancelled nor surrendered Tile's notes and there was no showing of an express agreement for a novation. The prosecution relied on the theory that the giving of the Lynch note and the bank's bookkeeping treatment of its effect amounted to payment [novation]. As hereinabove demonstrated, this was not enough. Viewing the evidence in the light most favorable to the verdict, and with deference to the dissenting opinion herein, the government simply failed to make out its case and the conviction under Count I should not be allowed to stand.

In expressing the view that we are "rejecting" or attempting to reverse *Capital National Bank of Tampa v. Hutchinson, supra,* the dissent misunderstands our position. We are neither rejecting nor attempting to reverse. We are simply saying that in view of the rule reiterated in 1964 in *Wishart, supra,* Nill may not be convicted on a construction of Florida law which was articulated after he had filed the claim and which, after the fact, altered his situation to his disadvantage, *Kring v. State of Missouri,* 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883); *Williams v. United States,* 5 Cir., 1950, 179 F.2d 644, 647, affirmed 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758 (1951).

### Count II

In its last two paragraphs, 18 U.S.C. § 152 provides:

"Whoever, after the filing of a bankruptcy proceeding, knowingly and fraudulently withholds from the receiver, custodian, trustee, marshal, or other officer of the court entitled to its possession, any document affecting or relating to the property or affairs of a bankrupt.

"Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

 Fraud connotes perjury, falsification, concealment, misrepresentation, *Knauer v. United,* 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946). It has been held that to establish fraud it is necessary to show a false representation of a material fact made with knowledge of its falsity with the intent to deceive, *Pence v. United States,* 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510 (1942).

 Count II of the indictment against Carl Jonathan Nill charged that he *knowingly* and *fraudulently* withheld from the Trustee a state bank liability ledger card in the name of Jacksonville Tile Company showing loans and repayments during the period of May 9, 1969 to October 28, 1969, reflecting an outstanding balance of *no indebtedness* as of October 28, 1969.

Two cards are involved, one considered genuine and the other which the government says was prepared by Nill and submitted in lieu of the card showing no balance. We have examined government's exhibit number 5, and government's exhibit number 7, and they look to us like liability ledger *sheets,* not cards.

In any event, there is no doubt that the term "card" was used and understood as being synonymous to "sheet" and nobody was in any way confused or mislead about that.

Nill learned that a subpoena from the Trustee in Bankruptcy was imminent. He arranged that it would be directed to him personally although such a subpoena normally would not have gone to *officers* of the Bank.

In response to the subpoena, Nill gave the Trustee a purported ledger sheet (card) showing a balance due by Tile, to the Bank, in the sum of $13,593.05. While the proof on this point was wholly circumstantial, there was proof from which the jury could infer that Nill either prepared the card or had it done.

At some unspecified later time, the bank officials discovered two ledger sheets for the Tile Company. One, which a bank officer testified was genuine as having been made from time to time by entries occurring in the due course of business, had two lines at the bottom which did not appear on the card which Nill sent to the Trustee. These lines indicated that on October 28, 1969, the Tile Company had paid $3,593.05 on the principal and $19.91 interest on Note Number 62,045. These lines also indicated that on the same day the Tile Company had paid $10,000 principal and $144.44 interest on Note Number 61,595, leaving the Tile Company indebtedness noted as "Paid in Full", with a balance of ".00". These entries were made in the bookkeeping department contemporaneously with the Lynch transaction already described.

The omission of these two lines on the ledger sheet which Nill gave the Trustee thus showed a balance due of $13,593.05. Except for this admission the entries on the two sheets were the same in all material particulars.

The indictment charged that the withholding of the original card was fraudulently done. Thus, our disposition of Count I dictates a like result in Count II.

### Admission of Prejudicially Irrelevant Evidence

Over defense objection, the government adduced evidence tending to prove that defendant had made a practice of loaning the bank's money to his own corporations; that his bank salary was only $18,000, yet his net worth was half a million dollars; that he was financially ambitious and had the goal of quickly becoming a millionaire. This testimony

covered a number of pages in the record, but its general tenor may be gleaned from the following excerpt from the government's cross examination of Nill when he took the witness stand in his own defense.

"Q. But you were really involved in several companies outside of your employment with State Bank, were you not?

"A. At that date that you mention, I would say no.

"Q. In the summer of 1969, were you involved with these three other companies you had an ownership interest in?

"A. Two or three, yes, sir.

"Q. Mr. Nill, isn't it true that your goal was to become a millionaire before you were 40?

"A. I wouldn't be able to say that. I was ambitious, yes, sir.

"Q. Didn't you tell several people exactly that, that it was your goal to become a millionaire before you were 40?

"A. I don't recall having said that, no, sir.

"Q. Do you think you could have said it?

"A. I suppose it is possible, but it is not likely.

"Q. But you don't remember whom you said that to, if you said it?

"A. No, sir, I don't.

"Q. Mr. Nill, isn't it a fact you were well under way to becoming a millionaire by the time you were 32?

"A. Yes, sir, I would say so.

"Q. How far along were you toward that goal?

"A. I don't know specifically.

"Q. October of 1971, did you estimate your net worth, that is, the worth of your assets over your liabilities at about a half a million dollars?

"MR. DATZ: I would object unless he can show the relevancy.

"THE COURT: I am going to let in.

"A. It is possible, but you would have to show me and we have to value my particular assets.

"Q. Let me show you something and ask if that refreshes your recollection?

"THE COURT: Mark that for identification.

"Q. Let me show you Government's Exhibit 19 that is marked for identification, and ask you to look at that and see if that refreshes your recollection about your estimated net worth in October of 1971.

"MR. DATZ: Excuse me. May I make another objection, Your Honor, on the time? The relevancy is a year later and we would object—

"THE COURT: I am going to let it stand.

"A. Yes, you have given me a financial statement, sir, that is dated October 26, 1971 that I believe bears my signature on it, a statement of the personal financial statement. Did you ask me a question?

"Q. Yes, sir. What was your net worth at that time, what did you estimate your worth to be?

"A. The financial statement shows at that time my net worth was $506,300, as an estimate.

"Q. And that was in October of 1971?

"A. Yes, sir, it is.

"Q. When did you leave the State Bank of Jacksonville?

"A. On August 15, 1971.

"Q. Is that some two months before that statement was signed?

"A. Yes, sir, that's right.

"Q. What was your salary at the State Bank, Mr. Nill?

"A. At that time I believe that my total compensation would have been approximately $18,000.

"Q. So you weren't going to reach your goal to being a millionaire on the bank's salary?

"A. That's right, sir.

"Q. Isn't it true that most of your income over this period of time came from outside interests?

"A. Yes, sir."

It is undoubtedly true that evidentiary questions of materiality, relevancy, and competency are for the resolution of the trial court in the exercise of sound discretion. Nothing but an abuse of that discretion, fraught with a reasonable likelihood of prejudice to the defendant will ordinarily warrant appellate interference.

The only possible relevancy of the above related testimony would be to show criminal design, motive, or intent on the part of Nill.

For the purpose of proving criminal motive, design, or intent the conduct allegedly committed at other times and places must not be too remote and must be similar, of probative value, supplying a need for the full development of the issues, and its possible prejudice must be balanced against these factors. *See United States v. Waller,* 5 Cir., 1972, 468 F.2d 327, *cert. denied,* 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 588; *United States v. Laurance,* 5 Cir., 1973, 480 F.2d 688; *United States v. Broadway,* 5 Cir., 1973, 477 F.2d 991; *United States v. Boyd,* 5 Cir., 1971, 446 F.2d 1267; *Hamilton v. United States,* 5 Cir., 1969, 409 F.2d 928; *United States v. Cavallino,* 5 Cir., 1974, 498 F.2d 1200; *United States v. Miller,* 5 Cir., 1974, 500 F.2d 751; and *United States v. Goodwin,* 5 Cir., 1974, 492 F.2d 1141.

We think it was relevant to show the salary made by this appellant, that he had outside interests, that he had been using the bank's money for the furtherance of those interests, and that he had a motive for wishing to retrieve Mr. Lynch's liability to the bank. The same might be said of any evidence reasonably calculated to show that Nill wished to conceal some of his financial transactions from the bank where bank funds were involved.

Nevertheless, our reading of this record convinces us that the cross examination of Nill was allowed to degenerate into a personal attack, calculated to appeal to bias on the part of the jury.

We refer to these questions in particular:

"Q. Mr. Nill, isn't it true that your goal was to become a millionaire before you were 40?

"Q. Didn't you tell several people exactly that, that it was your goal to become a millionaire before you were forty?

"Q. Do you think you could have said it?

"Q. But you don't remember whom you said that to, if you said it?

"Q. Mr. Nill, isn't it a fact you were well under way to becoming a millionaire by the time you were 32?

"Q. How far along were you toward that goal?"

Then, Nill was confronted with a financial statement made more than two years after the commission of the alleged offenses, revealing a net worth of $506,-300.

A man's wealth is wholly irrelevant to his guilt or innocence in a criminal prosecution unless the wealth is directly connected to the offense for which he is standing trial. Obviously, Nill's wealth was not acquired from the $13,593.05 set forth in this claim. The bank received the money; his friend received credit for it. Nill's net worth was not enhanced by it.

The record does not reveal how many, if any, of the jurors in this case were so poor that they had to be on welfare or the recipients of food stamps or forced by economic circumstances to do without many of the necessities, and maybe all of the luxuries, of life. We do not know what their attitude would be toward a man in his early thirties who aspired to

become a millionaire and had it half made.

Without any showing that Nill's acquisitions were criminal the plain impact of the above interrogation was to plant the idea in the minds of the jury that the defendant was not only rich by ordinary standards, but that he got that way by being a financial smart aleck or a "wheeler-dealer", who, on general principles, needed to be given his comeuppance. If a defendant had been subjected to such an irrelevant, derogatory attack on his poverty, no court would tolerate it. The rule works both ways, the well to do are entitled to the same fair treatment.

We cannot regard this interrogation as either relevant or free of prejudice.

Had it not been necessary for us to reverse, this would have mandated a new trial.

The judgment of the District Court as to both Counts I and II is

Reversed.

TUTTLE, Circuit Judge (dissenting).

With deference, I dissent.

In my view the majority can come to its conclusion that Nill's two convictions should be reversed, and indeed the indictments dismissed, only by expressly rejecting this Court's controlling decision of *Capital National Bank of Tampa v. Hutchinson*, 435 F.2d 46 (5th Cir. 1970) in which we thoroughly reviewed the Florida cases on novation, and held:

> "Express agreement becomes unnecessary when the parties clearly manifest an intention to effect a novation. Assent to, and acceptance of, the terms of a novation may be implied from the facts and circumstances attending the transaction and the parties' subsequent conduct."

435 F.2d at 50.

Applying this standard to the facts of this case, I am firmly of the view that Nill could be properly found by the jury to have intended a novation when he arranged, drafted and had Lynch sign the $20,000 promissory note, thereby discharging the earlier Tile Company obligations. Accordingly, I believe the jury was correct to find that when Nill submitted claims against the Tile Company he did so in violation of 18 U.S.C. § 152, and when he withheld genuine bank records which would have shown the claims to be false, he committed a second violation of 18 U.S.C. § 152.

Four facts stand out as posing a jury question on whether the Tile Company obligations were in fact discharged by the Lynch note:

(1) As the majority recognized, the record would support the inference that Nill had a vital interest in using the Lynch note to extinguish the earlier Tile Company obligations. Only through a novation would Nill accomplish the objective of concealing his possibly illegal and certainly unethical practices in violation of bank policy of lending excessive amounts of bank money to companies in which he held a substantial financial interest. Nill thus had an interest in using the Lynch note as a novation, not merely as a guarantee.

(2) The terms of the Lynch note are quite explicit:

"THIS IS YOUR AUTHORITY TO DISBURSE TO:

| | |
|---|---|
| JACKSONVILLE TILE COMPANY<br>Comm. Note 61595 | $10,144.44 |
| JACKSONVILLE TILE COMPANY<br>Comm. Note 62045 | $ 3,612.96 |
| INSTALLMENT LOAN OF GEORGE<br>D. BOND, JR.<br>42321 | $ 4,679.63 |
| BALANCE TO JAMES L. LYNCH | $ 1,562.97" |

Thus the bank is instructed to "disburse to" the four separate accounts the money obtained in exchange for the promissory note. Lynch entered into an unconditional obligation to repay the note within ninety days, at interest; this in no way resembles a mere guarantee of the Tile Company notes. The bank didn't treat it as a guarantee, funds were disbursed to Lynch himself, the Bond note was discharged, and the loan liability cards and the "tickler cards" in the files of the two Tile Company notes were stampted to reflect the discharge of the two notes. This would certainly permit the jury to find that the Lynch

note was not to guarantee the Tile Company notes, but to discharge them.

This theory that the Lynch note was only a guarantee was the only defense offered by Nill at trial; the jury could properly reject it. The bank had two standard forms of guaranteeing a third party's obligations—and neither involved incurring an unconditional obligation. Indeed, Lynch himself had previously guaranteed a portion of the Tile Company's obligations by endorsing the notes, not by obtaining a note in his own name.

(3) The Bank immediately treated the notes as discharged—the loan liability ledger cards were marked paid, and most significantly the index cards kept in the file with each promissory note known as "tickler cards" were also stamped PAID. The majority opinion does not mention these cards, yet testimony offered at trial established that these cards were the bank's principal bookkeeping index system, and that the bank relied on the notations on these cards as showing the status of an account rather than the note itself. Thus the majority's reliance on the fact that the bank did not stamp the promissory notes PAID is misplaced—in the bank's view the more important record was the tickler card, and in both cases they were stamped PAID on the date of the Lynch note.

Bank officers testified at trial that it was the invariable practice of the bank to stamp the tickler cards and the notes at the same time; the only reason the two notes were not stamped PAID must have been, they testified, that the notes were removed from their proper files. The record is silent as to how these notes were removed—but given the fact that the notes must have been secreted elsewhere by someone, with the effect of preventing them from being stamped PAID, it seems odd to me to rely on this fact to show the notes were not discharged.

(4) Finally, and most importantly, Nill's conduct in my view would permit the jury to find that *he* believed the Lynch note to have discharged the Tile Company's debts. There could be no other reason for him to submit falsified bank records if he believed the Lynch note had not discharged the two Tile Company notes. Withholding the genuine bank documents, which would have alerted the trustee in bankruptcy that a novation might have occurred, in my view gives rise to the inference that Nill believed a novation had occurred.

The majority treats this submission of falsified bank records in an odd way. Without disputing that the evidence was certainly sufficient to find that Nill had forged the records he submitted, the majority finds that because *it* doesn't believe a novation took place, then accordingly *Nill's* submission of forged records is without legal significance and cannot have been done with the requisite fraudulent intent.

In sum, I believe there was ample evidence from which the jury could find that a novation had occurred and that Nill knew it; that when he submitted a claim on behalf of the Bank he knew that in fact the Bank no longer was a creditor of the Tile Company. Had Lynch attempted to submit a claim on his own behalf there is no evidence he would have stood in as favorable a secured position as the Bank in obtaining partial payment from the bankrupt company—thus Nill could be found to have had the requisite fraudulent intent when he submitted a claim on behalf of the Bank which he knew to be false, and which he actually submitted on behalf of his friend Lynch. Although the majority does not mention it, the record shows that the money paid by the trustee to the bank was immediately deposited in Lynch's account, at Nill's direction.[1]

---

1. A corporate officer who claims the status of a secured creditor has the burden of proving far more than an outsider, like the Bank, must prove: "[D]isallowance or subordination of the claim of a controlling officer of a bankrupt corporation is determined 'in light of equitable considerations' and his dealings with the bankrupt are subjected to rigorous scrutiny, the burden being on him to prove not only good faith but inherent fairness from the viewpoint

The majority rejects the jury verdict, but it is difficult to understand by what process it arrives at this decision. First the opinion reviews Florida law on novation and decides that the cases require evidence of an express agreement of novation.[2]

Secondly, while not in so many words reversing this Court's decision in *Capital National Bank* which, after all, had construed precisely the same two cases discussed by the majority, and many more in addition to the two cases relied upon by the majority, the majority suggests that *Capital National Bank* cannot apply to this case because it was decided after Nill submitted his claim, and Nill had a right to rely on the weight of Florida authority on point. This is an odd view; this Court was bound by *Erie* to adhere to the controlling Florida law in *Capital National Bank*—and by applying *Erie* principles this Court determined that the weight of Florida authority did *not* require an express agreement of novation. To suggest that *Capital National Bank* announced a change in the Florida law on novation and thus may be given only prospective application completely misreads the opinion, and given the fact the Court was *Erie*-bound in the case, tacitly reverses the case. I cannot agree.

> "We are bound by this Court's prior decisions on what is the law of a state in a diversity case, just as we are bound by prior decisions of this Court on what is federal law."

*Newell v. Harold Shaffer Leasing Co.,* 489 F.2d 103, 107 (5th Cir. 1974).[3]

There has been no intervening Florida state decision which undermined the Court's decision in *Capital National Bank*, and thus I think it is clear we are bound by it. Thus

> "whether a novation exists, in any situation depends on factual allegations and proof, not legal conclusions."

435 F.2d at 50. The question of intent should be left to the jury, for

> "[o]nly when the intention and purpose of the taking of the promissory note appears conclusively to have been for the purpose of further securing an antecedent obligation will there remain no factual issue as to intent for the jury."

435 F.2d at 51.

The question of novation thus depends entirely on the factual issue of the intent of the parties. The jury resolved this question, implicitly finding a novation by finding Nill guilty of submitting a false claim to the trustee in bankruptcy. The majority now reverses this jury finding on the ground that

> "under the facts of this case [Nill] is entitled to the benefit of the later stated rule that the existence or absence of a clear manifestation of an intention to have so agreed [to novation] is a jury question. On the latter premise, he could not be branded criminally for submitting the claim and, if

of the corporation. The bankruptcy court should sift the circumstances surrounding any claim to see that no injustice is done, particularly, when the claim is one by an officer, director or stockholder, and disallowance or subordination may be grounded simply on violation of rules of fair play and good conscience." *3A Collier on Bankruptcy* ¶ 63.06[5.-3] at 1791 (14th Ed.) Thus I shouldn't think it is necessary to show that in fact Lynch's claim would have been subordinated to the claims of other secured creditors—for this decision should have been left to the bankruptcy court. Rather, Nill's conduct could have been found to have the requisite fraudulent intent from his refusal to permit the bankruptcy court to evaluate the merits of Lynch's claim, thus giving rise to the inference that Nill believed the Bank would receive better treatment at the

hands of the bankruptcy trustee than would Lynch, a half-owner of the company.

2. While the majority says the record doesn't disclose an express agreement on novation, I don't agree that this is correct. I think the majority is confusing a "written" agreement with an "express agreement"—for it does seem that Lynch and Nill "expressly" agreed as to the effect of the Lynch note, but since the exact terms of their agreement weren't set out in writing, it became a jury question.

3. We have many times reaffirmed the principle that one panel of this Court will not overrule the decision of another panel unless it is done by an en banc Court, or there has been an intervening change in the law. *Linebery v. United States*, 512 F.2d 510 (5th Cir., 1975) and cases cited therein.

it was contested, to have the factual issue decided in the bankruptcy court."

As I understood this passage, the majority holds either (1) the jury verdict must be reversed because the question of intent is a jury question, or (2) the proper forum for deciding whether novation occurred and whether the claim submitted was consequently a false one is in the bankruptcy court itself. The first simply is incomprehensible; we don't reverse a jury verdict because a jury question is presented, unless there was insufficient evidence for the jury to have decided novation occurred—and the majority nowhere discusses the sufficiency of the evidence as to intent save to announce:

"In the absence of a *clear agreement* (and there was none shown by the evidence in this case) there must be a clear manifestation of an intention that such was the agreement. In the end, this amounts to the same thing."

The majority does not discuss the facts I have set out which in my view presented a jury question as to the intent of the parties. It is clear to me that there was sufficient evidence, manifested by the conduct of the parties and the terms of their agreement, for the jury to find novation.

The second possible construction of the majority's holding is even less persuasive, however. The bankruptcy court which the majority says should have decided whether a novation took place was never apprised that the question existed: it didn't receive genuine bank documents showing the Tile Company's accounts as discharged, it received forged documents showing nothing of the Lynch note. Further it is unclear to me who would challenge the Nill claim thereby contesting the question and posing the issue for resolution by the bankruptcy court—the bank was not aware of the bankruptcy proceedings, as Nill had persuaded the trustee to forward subpoenas to him personally.

The notion that the falseness of the claim submitted by Nill should only be determined in the bankruptcy proceedings reflects what I believe to be the central thrust of the majority's opinion—that 18 U.S.C. § 152 involves only trivial offenses which should not be the subject of a prosecution in federal court. Unless the majority means to overrule this act of Congress making it a criminal offense to fraudulently submit a false claim in bankruptcy proceedings or to withhold genuine relevant documents from the trustee in bankruptcy, I fail to see how the court can hold that a jury in a federal criminal prosecution could not decide whether Nill's claim was false, but that this question should be left to the bankruptcy court. As I understand the opinion, then, it stands for the view that even if the Tile Company debt had been discharged and Nill knew it and submitted a claim he knew to be false, the jury nonetheless could never find the requisite fraudulent intent—in short, that 18 U.S.C. § 152 no longer can serve as the basis for a criminal prosecution. The majority thus holds, as a matter of law, such a claim is merely "erroneous" and can never be "wilfully fraudulent." It is only by so holding that the majority can justify its mandate to the district court to dismiss the indictments: the court thus holds not only that the evidence below was not sufficient to uphold the jury's verdict, but that *no evidence can be offered* which would prove Nill guilty of a violation of 18 U.S.C. § 152.

I disagree.

I also disagree with the majority's disposition of Count II, but as the majority only tracks its previous discussion in dealing with Count I, I do not discuss the question further.

I would finally reject the defendant's claim of prejudice arising from the Government's cross-examination of Nill as to his financial ventures. I believe the trial court properly exercised its discretion in permitting this cross-examination. Nill's pattern of self-dealing was important in evaluating why he would take the steps he did in concealing his involvement with the Tile Company. Only after realizing the nature of Nill's financial scheming could the jury appre-

ciate the risks the defendant faced should the general counsel of the Bank learn of the Tile Company's bankruptcy and thence of Nill's pattern of self-dealing, lending bank funds to corporations in which he had a substantial financial interest. I believe Nill's financial schemes were relevant to his motive and intent in concealing his true involvement in the Tile Company from bank officers.

While the majority does not reach the other claims of error made by the defendant, I have considered them and find them to be without merit. I would affirm the convictions.