**UNITED STATES of America,
Plaintiff, Appellee,**

v.

**Jose Manuel Martinez CANAS,
Defendant, Appellant.**

**No. 77–1507.**

United States Court of Appeals,
First Circuit.

Argued Feb. 5, 1979.

Decided April 5, 1979.

---

Daniel S. Pearson, Miami, Fla., with whom Pearson & Josefsberg, P. A., Miami, Fla., was on brief, for appellant.

Ramón L. Walker Merino, Asst. U. S. Atty., Hato Rey, P. R., with whom Julio Morales Sanchez, U. S. Atty., San Juan, P. R., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, JAMESON, Senior District Judge.*

JAMESON, Senior District Judge:

Defendant-appellant, Jose Manuel Martinez Canas, was convicted in a jury trial of conspiring to make false statements to a bank insured by the Federal Deposit Insurance Corporation in an application for a business loan, in violation of 18 U.S.C. §§ 371[1] and 1014,[2] and of making such false statements in connection with the loan application, in violation of 18 U.S.C. §§ 2 and 1014.

*Factual Background*

Defendant was president of a company known as Frito Lay de Puerto Rico, Inc., a subsidiary of Pepsico, Inc. Frito Lay had a line of credit with the Old San Juan Branch of Banco Popular de Puerto Rico (Bank) in the amount of $1,000,000. On or about December 22, 1976 the defendant requested, on behalf of Frito Lay, a loan of $1,500,000. The stated purpose of the loan was to permit Frito Lay to qualify for a tax exemption before the end of the year.

Sometime prior to December 22 there had been filed with the Bank a "Certificate of Resolution", dated October 14, 1976, reciting that on October 11 the Board of Directors of Frito Lay had adopted a resolution authorizing Martinez Canas to borrow from the bank and sign promissory notes in Frito Lay's name. This resolution was purportedly signed by Rafael Cortez Dapena, Secretary of Frito Lay.

On or about December 27, 1976 defendant filed with the Bank the following documents: (1) a "Continuing and Unlimited Guaranty" of Pepsico, Inc., purportedly signed by two Pepsico officers, Frank A. Peck, vice president and treasurer, and Harold Freeman, assistant treasurer,[3] which guaranteed loans to Frito Lay; (2) a "Certificate of Incumbency", signed by John Pagnucco as secretary of Pepsico, certifying that Peck and Freeman were Pepsico officers; and (3) a "Certified Copy of Resolutions", signed by Pagnucco, setting forth Pepsico resolutions authorizing its officers to execute the guarantee.

The loan was approved. The defendant then signed a promissory note for $1,500,000 as president of Frito Lay and also signed a letter directing the Bank to deposit the proceeds of the loan in an account of Distribuidoras Nacionales and then transfer $1,121,843 from that account to Frito Lay's account.

*Proceedings in District Court*

(a) *The Government's Case*

The six documents[4] submitted to the Bank and upon which the loan was based, were all listed in both counts of the indictment, including the receipt by the Bank of the six documents, which were received in evidence as Government exhibits. Defend-

---

* Of the District of Montana, sitting by designation.

1. 18 U.S.C. § 371 provides:
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 1014 provides:
   Whoever knowingly makes any false statement or report, . . . for the purpose of influencing in any way the action of . . . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation, . . . upon any application, . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both.

3. John Doe, a/k/a Frank A. Peck, and Richard Roe, a/k/a Harold Freeman, were charged with appellant in the indictment, but did not stand trial.

4. The October 14 "Certificate of Resolution", the three documents filed with the Bank on December 27, the promissory note, and the letter directing the Bank to deposit and transfer the proceeds of the loan.

ant's fingerprints were found on all of the documents. One of the Bank officials testified that the Bank required the guarantee of Pepsico, Inc. before making the loan.

A lawyer, who was a notary public, testified that on December 26, 1976, at defendant's request he notarized the document signed by Frank A. Peck and Harold Freeman, who were introduced to him by defendant as the vice president and treasurer and assistant treasurer of Pepsico, Inc.

Cortes Dapena, Secretary of Frito Lay, testified that he did not sign the Certificate of Resolution dated October 14, 1976[5] and was in London on that date; and that the Board of Directors of Frito Lay did not authorize the resolution. He also testified that he had no knowledge of a Frank A. Peck or Harold Freeman as officers of Pepsico, Inc., and that the treasurer of Pepsico, Inc. was Stillman Brown. He denied knowledge of any relationship between Distribuidoras Nacionales, Inc. and Frito Lay.

Lamar Lovvorn, Secretary-Treasurer of Frito Lay, Inc., a Delaware corporation, and assistant secretary of Pepsico, Inc., testified that neither Frank A. Peck nor Harold Freeman was ever an officer of Pepsico, Inc. and that Stillman Brown was vice president and treasurer of Pepsico, Inc. during 1976.

An attorney in the Law Department of Pepsico, Inc. testified that Stillman Brown was vice president and treasurer of Pepsico, Inc. in December, 1976; that to his knowledge there had never been a Frank A. Peck or a Harold Freeman serving as officers of Pepsico, Inc.; nor had there been any secretary by the name of John Pagnucco.[6] He testified also that the "Continuing and Unlimited Guaranty" did not follow the format customarily used by Pepsico, Inc.

At the close of the Government's case the court denied defendant's motion for acquittal, but dismissed from both counts of the indictment the portions of the charge based upon the promissory note and letter of instructions to the Bank, for the reason that both of these documents had in fact been signed by the defendant and were not false documents.

(b) *Defendant's case*

The defendant did not take the stand. His defense consisted of the testimony of the expert witness with respect to Cortes Dapena's signature on the Certificate of Resolution and three character witnesses.

At the close of all the evidence, the defendant renewed his motion for a judgment of acquittal, which was denied. The court also denied defendant's request that the jury be directed to render a special verdict. Defendant was found guilty on both counts of the indictment and sentenced to concurrent prison terms of five years and two years.

*Contentions on Appeal*

On appeal, defendant contends that:

(1) his right to a fair trial was destroyed by the conduct of the prosecutor in cross-examination of defendant's character witnesses and in closing argument in referring to his wealth and national origin and suggesting other criminal conduct;

(2) there was insufficient evidence to support a finding that he knew of the falsity of one of the documents specified in the indictment, and a general verdict accordingly violated due process;

(3) the prosecutor's reference during closing argument to the grand jury's considering his case and returning a true bill denied him a fair trial; and

(4) the court's instruction to the jury to view weaker and less satisfactory evidence with suspicion constituted an impermissible comment on the defendant's exercise of his right not to testify.

---

5. An F.B.I. examiner of questioned documents, called by the Government, and an expert witness called by the defendant, both expressed the opinion that it was Cortes Dapena's signature on the Certificate of Resolution.

6. Appellant does not challenge the sufficiency of the Government's evidence to show that Peck, Freeman and Pagnucco were not officers of Pepsico, Inc.

## I. *Misconduct of Prosecutor*

■ Appellant argues first that (a) the prosecutor's interrogation of the defendant's character witnesses and (b) his closing comments with respect to defendant's wealth and national origin and innuendoes as to how defendant obtained his wealth were improper and highly prejudicial. It is necessary to review the alleged misconduct in the light of the direct examination, defendant's objections thereto and the rulings of the district court, and the weight of the entire evidence.

The defendant called as character witnesses an actress, who was also a theatre and television producer, a well known concert pianist, and the director of the Carnegie Library in San Juan. All of them on direct examination (in addition to testifying as to defendant's reputation for truth and veracity and as a law abiding citizen) testified regarding defendant's many contributions to the arts, both personally and financially—in the "theatre, music and painting", his support of the Library and his collection of paintings and musical instruments.[7]

It is true that the prosecutor interrogated two of the character witnesses at length with respect to defendant's wealth and lifestyle, and the probable value of his many works of art.[8] The district court properly sustained a number of objections to specific questions and on one occasion instructed the jury to disregard the comment of the United States attorney and ordered the comment stricken from the record.

On cross-examination one of the witnesses testified that she knew the defendant was a Cuban and had lived in Puerto Rico about fifteen years. The prosecutor indicated at a bench conference that he intended to ascertain whether the witness knew defendant's reputation in Cuba. Counsel for the defendant moved for a mistrial. The court denied the motion and instructed the United States attorney to limit his cross-examination to the general reputation of the defendant in the community. The attorney then decided not to pursue further questioning with respect to defendant's reputation in Cuba.

In closing argument the prosecutor referred to the fact that defendant could not have brought his works of art from Cuba and that the jury could "wonder where they came from". Defendant's counsel objected and moved for a mistrial. The court sustained the objection, denied the motion for mistrial, and instructed the jury:

> The comments by Mr. Quiles are stricken from the record and the members of the jury are instructed to disregard it—and I really instruct you to disregard it. We are not trying a man by how he may have accumulated his wealth. We are trying a man by whatever he is charged in the indictment.

In support of his contention that appeals to class prejudice have always been condemned, appellant cites *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1939), where the Court recognized that "appeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them". The Court noted further, however, that "each case necessarily turns on its own facts". The Court concluded that the prosecutor's improper statements were "minor aberrations in a pro-

---

7. The actress, for example, testified that defendant was a "fantastic person" and was a generous person, "who loves art and he gives all his efforts, not just his personal effort, but also his economic effort to develop the arts in Puerto Rico". The pianist testified that defendant presented many concerts in his home, that "his home was full of pictures of all kinds, modern, all the pictures of all schools", and that defendant had been "a great stimulator of the arts in Puerto Rico, not only of music but also of painting and sculpture. He has been an art lover in the same way as Luis Ferre has been, is a great art lover in all the phases". The direct examination of this witness took nine pages of transcript; the cross examination, six pages.

8. It is apparent from the colloquy between court and counsel at bench conferences that the prosecutor was attempting to show that defendant came to Puerto Rico "starving from Cuba" and that from his earnings at Frito Lay he could not afford his works of art and "type of life".

longed trial and not cumulative evidence of a proceeding dominated by passion and prejudice" and that "reversal would not promote the ends of justice", *Id.* 240, 60 S.Ct. 852. The Court took into consideration the fact that it "was not a weak case" (*Id.* 239, 60 S.Ct. 852) and that the jury had been instructed to disregard some of the objectionable remarks. *Id.* 243, 60 S.Ct. 811.

Appellant relies heavily on *United States v. Nill*, 518 F.2d 793 (5 Cir. 1975). In *Nill* the majority opinion held (1) that the evidence was insufficient to sustain the conviction, and (2) that the prosecutor's cross-examination of the defendant constituted prejudicial error.[9] The court found prejudicial prosecutorial questions which "degenerate[d] into a personal attack, calculated to appeal to bias on the part of the jury", the plain impact of which "was to plant the idea in the minds of the jury that the defendant was not only rich by ordinary standards, but that he got that way by being a financial smart aleck or a "wheeler-dealer', who, on general principles, needed to be given his comeuppance". 518 F.2d at 802–03.

Unlike *Nill*, in this case the evidence was clearly sufficient to sustain a conviction. Viewing the record as a whole, and considering that the Government had a strong case, the nature of the direct examination of the character witnesses, and the rulings and admonitions given to the jury by the trial judge, we conclude that the prosecutor's questions and comments were not sufficiently prejudicial to warrant a reversal.

## II. *Duplicity and Failure to Require Special Verdict*

Appellant argues that the second count of the indictment was duplicitous and, in the absence of a special verdict, was fatally defective under *Bins v. United States*, 331 F.2d 390 (5 Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964). In the alternative, he contends that if the false

statement documents can be joined in a single count, the general verdict still cannot stand because of insufficient evidence of appellant's knowledge of the falsity of one of the documents—the Certificate of Resolution, purportedly signed by Cortes Dapena.

### (a) *Duplicity*

█ Duplicity is the joining in a single count of two or more distinct and separate offenses. In *Bins*, the defendant was convicted on three counts of making false statements to the Federal Housing Authority in violation of 18 U.S.C. §§ 1001 and 1010. Each of the first two counts charged defendant with knowingly filing false statements on FHA Forms 2004G and 2004C. In finding the counts duplicitous, the court held that even though all of the documents in each count were part of a single transaction, the "filing of each false document would constitute a crime," and since dissimilar facts would have to be proved, there was more than one offense, and each should be alleged in a separate and distinct count. 331 F.2d at 392–93.

The Government argues that *Bins* is distinguishable in that the documents submitted in that case were complete in themselves, whereas here each document was a necessary part of the loan application and each was required before the Bank would make the loan. In other words, the documents were interrelated and in the absence of any one of them, the "false statement or report" was incomplete.

Whether or not this case is factually distinguishable from *Bins*, we find merit in the Government's position. Only one loan was involved. While several false statements were submitted, all were required before the loan could be approved. The focus of the offense is influencing the action of the Bank.

Other circuits have not adopted the strict "dissimilar facts" approach of *Bins*.[10] In

---

9. Judge Tuttle, in dissenting, would have affirmed the conviction on both grounds.

10. The question of whether a count is duplicitous has arisen frequently in cases involving

possession of drugs with intent to distribute and distribution. In *United States v. Orzechowski*, 547 F.2d 978, 986–87 (7 Cir. 1976), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52

*United States v. UCO Oil Co.*, 546 F.2d 833, 835–38 (9 Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977), the district court had dismissed as duplicitous an indictment in which the Government had charged a violation of § 1001 in each of a number of counts in making a false statement and a concealment of a material fact by trick, scheme or device. In reversing, the court held that "Congress was concerned with proscribing the prohibited result rather than particular kinds of conduct" and that "consistency calls for interpreting the enumeration of different kinds of conduct in the statute as reflecting different modes of achieving that result, not separate and distinct offenses". 546 F.2d at 836.[11] While not precisely in point factually, here Congress was concerned with proscribing the influencing of the action of a bank in an application for a loan, and each required statement was a part of achieving that result and not a separate and distinct offense.[12]

### (b) *Form of Verdict*

■ Appellant next argues that even "if *Bins* be not persuasive", his conviction on both counts must be reversed because there was insufficient evidence that he knew the Certificate of Resolution to be false, citing *United States v. Dota*, 482 F.2d 1005, 1006 (10 Cir.), *cert. denied*, 414 U.S. 1071, 94 S.Ct. 583, 38 L.Ed.2d 477 (1973).

In *Dota* the defendant was indicted in one count with making seven different false representations in applying for a loan, in violation of 18 U.S.C. § 1014. The case was submitted to the jury upon a general verdict. Defendant argued that there was not substantial evidence as to certain of the

false statements, and since there was no method of determining which of the false statements the jury relied upon in reaching its verdict, a reversal was required. The court recognized that if there were in fact insufficient evidence to send the case to the jury as to any of the statements, a reversal would be required; but in viewing the evidence most favorably to the Government, it found substantial evidence to support each false statement. 482 F.2d at 1006–07.

We do not question the holding in *Dota*, but agree with the Government that viewing the evidence in the light most favorable to the Government, there was ample evidence from which the jury could find that appellant knew the Certificate of Resolution was false. Cortes Dapena denied knowledge of the document, yet the certificate was purportedly from him with his signature attached; Cortes Dapena testified that he was in Europe when the certificate was dated and filed with the Bank; appellant's signature appears on the certificate; appellant's fingerprints appear on the certificate; someone from Frito Lay gave the certificate to the Bank; and the certificate was one of the documents needed to approve the loan.

■ In any event, the evidence was sufficient to sustain the conviction on the conspiracy count. As the Court noted in *Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), the "gist of the crime of conspiracy . . . is the agreement or confederation of the conspirators to commit one or more unlawful acts" where one or more of the persons " 'do any act to effect the object of the conspiracy' ". The Court continued: "The overt act, without

L.Ed.2d 391 (1977), the court held that charges of possession and distribution in one count were not duplicitous. The court noted a division in the circuits, with the Fifth Circuit holding that the joinder of possession with intent to distribute and distribution is duplicitous, and the Fourth, Sixth and Tenth Circuits taking a contrary position.

11. See also *United States v. Warner*, 428 F.2d 730, 735 (8 Cir.) *cert. denied*, 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 191 (1970).

12. This court has not heretofore considered the precise question here presented. The court did note by way of dictum in *United States v. Barbato*, 471 F.2d 918 (1 Cir. 1973), that "where a statute, like § 1010, sets forth several different means by which an offense may be committed, it is permissible for a count in an indictment to allege all or several of these means in the conjunctive". *Id.* at 922, n.3.

**80**

proof of which a charge of conspiracy cannot be submitted to the jury, may be that of only a single one of the conspirators and need not be itself a crime." *Id.* at 53, 63 S.Ct. at 101. Here the Government clearly proved more than one overt act. The Court noted further in *Braverman* that, "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects,'" citing *Frohwerk v. United States*, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561 (1919). *Id.* at 54, 63 S.Ct. at 102.

### III. *Prosecutor's Reference to Grand Jury*

■ Appellant claims that he was denied a fair trial by the prosecutor's reference in closing argument to the fact that the Grand Jury "had considered the defendant's case and decided to return a true bill" and the court's comment that the remark meant: "Just that the Grand Jury has returned a verdict."

This contention must be considered in the context of the argument of defendant's counsel, who said in part:

> Lastly this morning two men from Pepsicola, Mr. Lovvorn and Mr. Ramiro Martinez Wiley, fascinating the ways things get switched around. Now it is the FBI's case. For a while there it is Pepsico sitting there. There, what is their interest in this case? Why do they care about it? Why was Mr. Rosenstein down here saying, "We want money"?

In response, Government counsel said:

> Now, it has been suggested that this prosecution was initiated, instigated and the people behind it are Pepsico. Well, gentlemen, I think the record shows that when it was discovered February 17, the defendant was arrested. Did Pepsico file a complaint, two months before the alleged Rosenstein made an offer, a Grand Jury for this District, people like you, sat and considered the defendant's case and decided to return a true bill.

In light of the argument of defense counsel, we do not find the argument of Government counsel prejudicial. Moreover, in his

charge, the trial judge instructed the jury that the "indictment is but a formal method of accusing a defendant of a crime. It is not evidence of any kind against the accused, and does not create any presumption or permit any inference of guilt".

### IV. *Court's Charge on "Weaker and Less Satisfactory Evidence"*

■ Finally, appellant contends that the court's instruction that if a party offers weaker and less satisfactory evidence when stronger and more satisfactory evidence could have been produced, the jury may view that evidence with suspicion, was an impermissible comment upon the defendant's failure to testify. No objection was made to the instruction. Appellant argues, however, that the instruction was plain error, and that this court's opinion in *United States v. Flannery*, 451 F.2d 880 (1 Cir. 1971), requires reversal.

In *Flannery*, the defendant, who was indicted for conspiracy to circulate forged postal orders, did not testify. The principle witness against the defendant was a co-conspirator who testified to conversations between the defendant and himself. During the Government's closing argument the prosecutor repeated three times that the co-conspirator's testimony as to these conversations was "uncontradicted". The court reversed defendant's conviction for this error and warned:

> Hereafter, as to cases tried after the date of this opinion, when it is apparent on the record that there was no one other than himself whom the defendant could have called to contradict the testimony, we shall not endeavor to weigh prejudice, but shall rule it prejudicial as matter of law, with a single exception. If the court interrupts the argument, instructs the jury fully on the defendant's constitutional right not to testify and the jury's obligation not to draw unfavorable inferences and, in addition, states to the jury that the U.S. Attorney was guilty of misconduct, we may find no prejudice; otherwise we will reverse. 451 F.2d at 882.

We find *Flannery* distinguishable. First, the reference here, by the court instead of the prosecutor, was not to "uncontradicted" statements which only the defendant could have rebutted. Second, counsel for appellant (after consulting with his client at the court's request) expressly requested that the court should not instruct the jury on defendant's constitutional right not to testify. Third, it does not appear that the standard instruction on "weaker and less satisfactory evidence" constitutes a comment on defendant's failure to testify. Apparently counsel for appellant did not so construe it when the instruction was given. Fourth, the instruction was qualified by immediately preceding and subsequent instructions. The three instructions read:

> The jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

> If a party offers weaker and less satisfactory evidence when stronger and more satisfactory evidence could have been produced, you may view the evidence with suspicion.

> You must remember, however, that the defendant is not obliged to produce any evidence or to call any witnesses.[13]

The instruction does not constitute plain error requiring reversal of the conviction.

We affirm the convictions on both counts.

---

**13.** It may be noted also that four times during thorough and detailed instructions, the court reminded the jury that the law never imposes upon a defendant the burden or duty of calling any witnesses or producing any evidence.